# EXHIBIT 1



A Member of the Tokio Marine Group

One Bala Plaza, Suite 100, Bala Cynwyd, Pennsylvania 19004
610.617.7900 • Fax 610.617.7940 • PHLY.com

11/10/2021

Smith Ventures, Ltd dba Gibson
Athletic and Rage Fitness Supply
13333 E 37th Ave
Denver, CO 80239-3506

Re: **PHSD1673212**

Dear Valued Customer:

Thank you very much for choosing Philadelphia Insurance Companies (PHLY) for your insurance needs. Our A++
(Superior) AM Best financial strength rating is one reason why over 700,000 policyholders have put their trust in
us. We invite you to experience The PHLY *Difference,* which includes:

- Exceptional Customer Service
- Complimentary & Tailored Risk Management
- Best in Class Claims Experience
- Industry Leading Coverage
- Team PHLY Working for You!

We realize you have a choice in insurance companies, and we truly appreciate your business.
Welcome to TeamPHLY, and please visit us at PHLY.com to learn more about The PHLY *Difference*!

Sincerely,

John W. Glomb, Jr.
President & CEO
Philadelphia Insurance Companies

JWG/sm

---

DEFS-000072

# **PHLY** Customer Service

## VISIT My**PHLY.COM** TO GET STARTED



### My**PHLY** ONLINE PORTAL

- Enhanced Self Service Options and Mobile Browsing
- View Payment History, Invoices, and Policy Documents
- Report and Search Claims
- Direct Deposit Commission Payments
- Edit User Profile and Contact Information



### DIRECT CUSTOMER BILLING BENEFITS

- Receive invoice direct from PHLY
- Go Paperless with e-billing
- Never forget a payment with PHLY Recurring Payments
- Flexible Payment Plans
- Automated Payment Application for faster processing



### PAYMENT OPTIONS

- Online – PHLY.com/MyPHLY
- Phone – 877.438.7459, option 1
- Mail – P.O. Box 70251, Philadelphia, PA 19176-0251



### ON DEMAND CUSTOMER SERVICE ACCESS

- Live Chat - PHLY.com
- Phone - 877.438.7459
- Email - service@phly.com
- Hours: Monday - Friday 8:30 a.m. - 8:00 p.m. ET



The PHLY *Difference*

800.873.4552
**PHLY.com**

Philadelphia Insurance Companies is the marketing name for the insurance company subsidiaries of the Philadelphia Consolidated Holding Corp., a Member of the Tokio Marine Group. Your insurance policy, and not the information contained in this document, forms the contract between you and your insurance company. If there is a discrepancy or conflict between the information contained herein and your policy, your policy takes precedence. All coverages are not available in all states due to state insurance regulations. Certain coverage(s) may be provided by a surplus lines insurer. Surplus lines insurers do not generally participate in state guaranty funds and insureds are therefore not protected by such funds. | © 2007-2019 Philadelphia Consolidated Holding Corp., All Rights Reserved.

DEFS-000073



# The PHLY *Difference*



**PHLY** Customer Service

## Exceptional Customer Service

- Net Promoter Score among the industry's best
- Voice of the Customer empowers customer feedback
- Self Service at MyPHLY.com
- Direct Bill with payment plans
- Dedicated billing representative

**TEAM PHLY**

## TEAM**PHLY** - working for you!

- Marketing/Underwriting/Account Management team advocating on your behalf
- Account Stewardship
- Giving back to local communities



**PHLY** RISK MANAGEMENT SERVICES

## Complimentary & Tailored Risk Management

- PHLYTrac GPS Program
- SmarterNow Online Learning Management System
- Abuse Prevention Systems Program
- PHLYSense Temperature/Water Monitoring Program



## Industry Leading coverages

- Full Suite of coverages - package, automobile, umbrella, D&O, Cyber, A&H, Environmental, Surety
- Industry specific coverage enhancements
- Admitted & Non-admitted

## Best in class Claims Experience

- 96%+ Customer Satisfaction Rating
- Industry and Type-of-Loss Claims Specialists
- In-house Recovery and Subrogation
- Claim-specific reserving practices



*Hear what our agents are saying about their experience with The PHLY Difference.*

**Learn more:** ThePHLYDifference.com

# 800.873.4552 | **PHLY.com**

Philadelphia Insurance Companies is the marketing name for the insurance company subsidiaries of the Philadelphia Consolidated Holding Corp., a Member of the Tokio Marine Group. Coverage(s) described may not be available in all states and are subject to underwriting and certain coverage(s) may be provided by a surplus lines insurer. Surplus lines insurers do not generally participate in state guaranty funds and insureds are therefore not protected by such funds. | © 2021 Philadelphia Consolidating Holding Corp., All Rights Reserved.



Ed. 022321

DEFS-000074



# Risk Management Services

## PHLY RMS RESOURCES

Welcome to Philadelphia Insurance Companies (PHLY)! As a PHLY customer, your organization now has access to tools and services that can assist in your risk management efforts. Our Risk Management Services (RMS) Consultants can provide in-person assistance, from leading employee safety meetings to providing valuable guidance regarding safety best practices.

PHLY also provides various risk management tools and resources at little or no additional cost to your organization.

To access these resources, please take a moment to **register on our website**. If you already have an account on PHLY.com, please **log in** to access Risk Management Services resources.

### Risk Management Resources
We encourage you to explore the following risk management resources:



**PHLYTrac:** PHLY's telematics tool providing an online dashboard that tracks location, speeding, hard breaking, and other fleet statistics - PROVIDED AT NO COST TO ELIGIBLE PHLY CUSTOMERS!
**PHLY**TRAC



The **PHLY**Sense System is a property monitoring tool that uses a sensor to provide immediate alerts to hazardous property conditions, such as low temperature or the presence of moisture. Provided at no cost to our customers with property coverage.
**PHLY**SENSE



**Abuse Prevention Resources:** Online training and policy support to help improve the safety of child-serving operations (at no cost to our customers with Abuse coverage)
Abuse Prevention System



**IntelliCorp:** Provides a discounted background check package as well as discounted pricing for add-on services, such as Motor Vehicle Reports (MVRs).
IntelliCorp

**SmarterNow:** PHLY's no-cost Learning Management System that provides online training, assignment, and reporting capabilities. Trainings include defensive driver, discrimination in the workplace, security awareness, and many more
SMARTER**NOW!**

**Wilson Elser Hotline:** Provides two hours of legal consultation per occurrence. Provided at no cost for our Management and Professional and EPLI policyholders.
Wilson Elser

## CONTACT
For questions about your organization's risk management needs and information on PHLY's Risk Management Services please contact PHLY RMS:
Phone: 1.800.873.4552 #4 (Mon-Fri 8:30 a.m. - 5:00 p.m. ET)
E-mail: phlyrms@phly.com

## 800.873.4552 | **PHLY.com**          The PHLY *Difference*

Philadelphia Insurance Companies is the marketing name for the insurance company subsidiaries of the Philadelphia Consolidated Holding Corp., a Member of the Tokio Marine Group. Coverage(s) described may not be available in all states and are subject to underwriting and certain coverage(s) may be provided by a surplus lines insurer. Surplus lines insurers do not generally participate in state guaranty funds and insureds are therefore not protected by such funds. | © 2021 Philadelphia Consolidating Holding Corp., All Rights Reserved.



Ed. 022321

DEFS-000075



One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
610.617.7900 Fax 610.617.7940
PHLY.com

# Philadelphia Indemnity Insurance Company

# Commercial
# Lines
# Policy

THIS POLICY CONSISTS OF:

– DECLARATIONS
– COMMON POLICY CONDITIONS
– ONE OR MORE COVERAGE PARTS. A COVERAGE PART CONSISTS OF:
• ONE OR MORE COVERAGE FORMS
• APPLICABLE FORMS AND ENDORSEMENTS

**IN WITNESS WHEREOF**, we have caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless signed by our authorized representative.

John W. Glomb, Jr.
President & CEO

Secretary

2J-1 (12-98)



# Risk Management Services

## POLICYHOLDER NOTICE (LOSS ASSISTANCE HOTLINE)

As a free service benefit to its policyholders, PHLY has partnered with nationally recognized law firm Wilson, Elser, Moskowitz, Edelman & Dicker LLP (WEMED), to offer a toll-free Loss Assistance Hotline. The telephone number is 877.742.2201 or you can contact a WEMED attorney online at: apps.wilsonelser.com/pic/. This hotline provides you with 2 free hours of legal consultation with a knowledgeable attorney on any matter that you feel could result in a Claim under your professional or management liability policy. The Loss Assistance Hotline is NOT a Claim reporting service. To report a Claim, follow the Claim reporting instructions in your policy and also notify your insurance agent. If you have any questions concerning the Loss Assistance Hotline, please contact us at 800.759.4961 x2967.



# 800.873.4552

Philadelphia Insurance Companies is the marketing name for the insurance company subsidiaries of the Philadelphia Consolidated Holding Corp., a Member of the Tokio Marine Group. Your insurance policy, and not the information contained in this document, forms the contract between you and your insurance company. If there is a discrepancy or conflict between the information contained herein and your policy, your policy takes precedence. All coverages are not available in all states due to state insurance regulations. Certain coverage(s) may be provided by a surplus lines insurer. Surplus lines insurers do not generally participate in state guaranty funds and insureds are therefore not protected by such funds. | © 2013 Philadelphia Insurance Companies, All Rights Reserved.







PI-FEES-NOTICE 1 (11/19)

# NOTICE
# LATE FEE
# NON-SUFFICIENT FUNDS FEE
# REINSTATEMENT FEE

**Late Fee**
Please be advised that if your payment is late (payment is not received within five days of the payment due date indicated on the invoice), you will be charged a late fee of $25* (where permitted).

**Non-Sufficient Funds Fee**
Please be advised that if your payment is returned for non-sufficient funds, you will be charged a fee of $25** (where permitted).

**Reinstatement Fee**
Please be advised that if your policy is cancelled due to non-payment of the premium and we agree to reinstate your policy, you will be charged a reinstatement fee of $50*** (where permitted).

These fees are in addition to any premium owed on the policy and each fee can apply more than once during the policy term.

*$10 in Florida, Maryland, South Carolina

**$15 in Florida and $20 in New York

***$25 in Delaware, Georgia, New Hampshire and New Mexico; and $15 in Kansas and Nebraska

PI-FEES-NOTICE 1 (11/19)

DEFS-000079



PHILADELPHIA
INSURANCE COMPANIES
A Member of the Tokio Marine Group

One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
610.617.7900 Fax 610.617.7940
PHLY.com

**Philadelphia Indemnity Insurance Company**

## COMMON POLICY DECLARATIONS

**Policy Number:** PHSD1673212

**Named Insured and Mailing Address:**
Smith Ventures, Ltd dba Gibson
Athletic and Rage Fitness Supply
13333 E 37th Ave
Denver, CO 80239-3506

**Producer:** 25746
CRS Insurance Brokerage
6600 East Hampden Avenue
Denver, CO 80224

(303)996-7800
at 12:01 A.M. Standard Time at your mailing
address shown above.

**Policy Period From:** 01/01/2022  **To:** 01/01/2023

**Business Description:** For Profit Organization

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS
POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS
INDICATED.  THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT.

| | PREMIUM |
|---|---|
| Commercial Property Coverage Part | |
| Commercial General Liability Coverage Part | |
| Commercial Crime Coverage Part | |
| Commercial Inland Marine Coverage Part | |
| Commercial Auto Coverage Part | |
| Businessowners | |
| Workers Compensation | |
| Private Company Protection | ▇▇▇▇ |
| **Total** | **$** ▇▇▇▇ |

FORM (S) AND ENDORSEMENT (S) MADE A PART OF THIS POLICY AT THE TIME OF ISSUE
**Refer To Forms Schedule**

*Omits applicable Forms and Endorsements if shown in specific Coverage Part/Coverage Form Declarations

CPD- PIIC (06/14)

*Secretary*

John W. Glomb, Jr.
President & CEO

DEFS-000080

Philadelphia Indemnity Insurance Company

Form Schedule – Policy

**Policy Number:** PHSD1673212

Forms and Endorsements applying to this Coverage Part and made a part of this
policy at time of issue:

| Form | Edition | Description |
|---|---|---|
| BJP-190-1 | 1298 | Commercial Lines Policy Jacket |
| LAH-Notice | 0813 | Policyholder Notice (Loss Assistance Hotline) |
| PI-FEES-NOTICE 1 | 1119 | Notice Late/Non-Sufficient Funds/Reinstatement Fee |
| CPD-PIIC | 0614 | Common Policy Declarations |
| PI-TER-DN1 | 0115 | Disclosure Notice Of Terrorism Ins Coverage Rejection |

DEFS-000081

PI-PRD-1 (09/02)



One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
610.617.7900 Fax 610.617.7940
PHLY.com

**Private Company Protection Plus**

DIRECTORS AND OFFICERS & PRIVATE COMPANY LIABILITY
EMPLOYMENT PRACTICES LIABILITY INSURANCE
FIDUCIARY LIABILITY INSURANCE

**Philadelphia Indemnity Insurance Company**

Policy Number:  PHSD1673212

DECLARATIONS

**NOTICE: EXCEPT TO SUCH EXTENT AS MAY OTHERWISE BE PROVIDED HEREIN, THIS POLICY IS WRITTEN ON A CLAIMS MADE BASIS AND COVERS ONLY THOSE CLAIMS FIRST MADE DURING THE POLICY PERIOD AND REPORTED IN WRITING TO THE INSURER PURSUANT TO THE TERMS HEREIN.  THE AMOUNTS INCURRED FOR DEFENSE COST SHALL BE APPLIED AGAINST THE RETENTION.**

| Item | 1. | Private Company Name and Address: |
|---|---|---|

Smith Ventures, Ltd dba Gibson
Athletic and Rage Fitness Supply
13333 E 37th Ave
Denver, CO 80239-3506

Internet Address: www.

| Item | 2. | Policy Period: | From: 01/01/2022 | To: 01/01/2023 |
|---|---|---|---|---|

(12:01 A.M. local time at the address shown in Item 1.)

Item 3. Limits of Liability:
(A)  Part 1, D&O Liability:                    $                        each Policy Period.
(B)  Part 2, Employment Practices:  $    1,000,000 each Policy Period.
(C)  Part 3, Fiduciary Liability:            $                        each Policy Period.
(D)  Aggregate, All Parts:                   $    1,000,000 each Policy Period.

Item 4. Retention:
(A)  Part 1, D&O Liability:         $                for each Claim under Insuring Agreement B & C.
        Private Offering: $                for each Claim under Insuring Agreement B & C.
(B)  Part 2, Employment Practices:  $    25,000 for each Claim.
(C)  Part 3, Fiduciary Liability:         $                for each Claim.

Item 5. Prior and Pending Date: Part 1 No Date Applies   Part 2     01/01/2020  Part 3 No Date Applies

Item 6. Premium:           Part 1                      Part 2 $  ▮▮▮▮▮▮      Part 3

                                                Total Premium:  $  ▮▮▮▮▮▮

Item 7. Endorsements:  SEE SCHEDULE

DEFS-000082

PI-PRD-1 (09/02)

In witness whereof, the Insurer issuing this Policy has caused this Policy to be signed by its authorized officers, but it shall not be valid unless also signed by the duly authorized representative of the Insurer.

John W. Glomb, Jr.
President & CEO

_____
Countersignature

_____
Countersignature Date

DEFS-000083

Philadelphia Indemnity Insurance Company

Form Schedule – Private Company Protection Plus

**Policy Number:** PHSD1673212

Forms and Endorsements applying to this Coverage Part and made a part of this
policy at time of issue:

| Form | Edition | Description |
|------|---------|-------------|
| PI-PRD-1 | 0902 | Private Company Protection Plus Declarations |
| PI-BELL-1 | 1109 | Bell Endorsement |
| PI-CME-1 | 1009 | Crisis Management Enhancement Endorsement |
| PI-MANU-1 | 0100 | DEFENSE ONLY WAGE & HOUR CARVEBACK with RETENTION |
| PI-MANU-1 | 0100 | WORKPLACE VIOLENCE INSURANCE COVERAGE |
| PI-MANU-1 | 0100 | Amended Bodily Injury / Property Damage Exclusion |
| PI-MANU-1 | 0100 | ABUSE EXCLUSION WITH WORKPLACE HARASSMENT CARVEBACK |
| PI-MANU-1 | 0100 | IMMIGRATION CLAIM COVERAGE |
| CO-Disclosure | 1204 | Disclosure Form - Claims-Made Policy - Colorado |
| PI-PRD-2 | 0902 | Private Company Protection Plus Policy |
| PI-PRD-72 | 0506 | Business Advantage Pro-Pak Elite Coverage |
| PI-PRD-75 | 1203 | Amendment of Exclusions |
| PI-PRD-77 | 0104 | Amendment of Cancellation Provision |
| PI-SLD-001 | 0115 | Cap On Losses From Certified Acts Of Terrorism |

DEFS-000084

PI-TER-DN1 (01/15)

**Policy Number:** PHSD1673212     **Named Insured:** Smith Ventures, Ltd dba Gibson



**PHILADELPHIA INSURANCE COMPANIES**
A Member of the Tokio Marine Group

One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
610.617.7900 Fax 610.617.7940
PHLY.com

Terrorism Premium (Certified Acts) $ Included

## PHILADELPHIA INSURANCE COMPANIES
## DISCLOSURE NOTICE OF TERRORISM INSURANCE COVERAGE REJECTION OPTION

You are hereby notified that under the Terrorism Risk Insurance Act, as amended, you have a right to purchase insurance coverage for losses resulting from acts of terrorism. *As defined in Section 102(1) of the Act*: The term "act of terrorism" means any act or acts that are certified by the Secretary of the Treasury—in consultation with the Secretary of Homeland Security, and the Attorney General of the United States—to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

YOU SHOULD KNOW THAT WHERE COVERAGE IS PROVIDED BY THIS POLICY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM, SUCH LOSSES MAY BE PARTIALLY REIMBURSED BY THE UNITED STATES GOVERNMENT UNDER A FORMULA ESTABLISHED BY FEDERAL LAW. HOWEVER, YOUR POLICY MAY CONTAIN OTHER EXCLUSIONS WHICH MIGHT AFFECT YOUR COVERAGE, SUCH AS AN EXCLUSION FOR NUCLEAR EVENTS. UNDER THE FORMULA, THE UNITED STATES GOVERNMENT GENERALLY REIMBURSES 85% THROUGH 2015; 84% BEGINNING ON JANUARY 1, 2016; 83% BEGINNING ON JANUARY 1, 2017; 82% BEGINNING ON JANUARY 1, 2018; 81% BEGINNING ON JANUARY 1, 2019 and 80% BEGINNING ON JANUARY 1, 2020, OF COVERED TERRORISM LOSSES EXCEEDING THE STATUTORILY ESTABLISHED DEDUCTIBLE PAID BY THE INSURANCE COMPANY PROVIDING THE COVERAGE. THE PREMIUM CHARGED FOR THIS COVERAGE IS PROVIDED ABOVE AND DOES NOT INCLUDE ANY CHARGES FOR THE PORTION OF LOSS THAT MAY BE COVERED BY THE FEDERAL GOVERNMENT UNDER THE ACT.

YOU SHOULD ALSO KNOW THAT THE TERRORISM RISK INSURANCE ACT, AS AMENDED, CONTAINS A $100 BILLION CAP THAT LIMITS U.S. GOVERNMENT REIMBURSEMENT AS WELL AS INSURERS' LIABILITY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM WHEN THE AMOUNT OF SUCH LOSSES IN ANY ONE CALENDAR YEAR EXCEEDS $100 BILLION. IF THE AGGREGATE INSURED LOSSES FOR ALL INSURERS EXCEED $100 BILLION, YOUR COVERAGE MAY BE REDUCED.

**Your attached proposal (or policy) includes a charge for terrorism. We will issue (or have issued) your policy with terrorism coverage unless you decline by placing an "X" in the box below.**

**NOTE 1:** If –included is shown on your proposal (or policy) for terrorism you WILL NOT have the option to reject the coverage.

**NOTE 2:** You will want to check with entities that have an interest in your organization as they may require that you maintain terrorism coverage (e.g. mortgagees).

**EXCEPTION:** If you have property coverage on your policy, the following Standard Fire Policy states do not permit an Insured to reject fire ensuing from terrorism:  CA, CT, GA, HI, IA, IL, ME, MA,MO, NJ, NY, NC, OR, RI, VA, WA, WV, WI. Therefore, if you are domiciled in the above states and reject terrorism coverage, you will still be charged for fire ensuing from terrorism as separately designated on your proposal.

DEFS-000085

PI-TER-DN1 (01/15)

| | I decline to purchase terrorism coverage. I understand that I will have no coverage for losses arising from "certified" acts of terrorism, EXCEPT as noted above. |
|---|---|

**You, as the Insured, have 30 days after receipt of this notice to consider the selection/rejection of "terrorism" coverage.   After this 30 day period, any request for selection or rejection of terrorism coverage WILL NOT be honored.**

**REQUIRED IN GA – LIMITATION ON PAYMENT OF TERRORISM LOSSES** (applies to policies which cover terrorism losses insured under the federal program, including those which only cover fire losses)
The provisions of the Terrorism Risk Insurance Act, as amended, can limit our maximum liability for payment of losses from certified acts of terrorism.  That determination will be based on a formula set forth in the law involving the national total of federally insured terrorism losses in an annual period and individual insurer participation in payment of such losses.  If one or more certified acts of terrorism in an annual period causes the maximum liability for payment of losses from certified acts of terrorism to be reached, and we have satisfied our required level of payments under the law, then we will not pay for the portion of such losses above that maximum.  However, that is subject to possible change at that time, as Congress may, under the Act, determine that payments above the cap will be made.

INSURED'S SIGNATURE_____
DATE_____

DEFS-000086

PI-BELL-1 (11/09)

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## BELL ENDORSEMENT



One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
610.617.7900 Fax 610.617.7940
PHLY.com

Unless otherwise stated herein, the terms, conditions, exclusions and other limitations set forth in this endorsement are solely applicable to coverage afforded by this endorsement, and the policy is amended as follows:

**I.    SCHEDULE OF ADDITIONAL COVERAGES AND LIMITS**

The following is a summary of Limits of Liability or Limits of Insurance and/or additional coverages provided by this endorsement.  This endorsement is subject to the provisions of the policy to which it is attached.

| COVERAGE | LIMITS OF INSURANCE |
|---|---|
| Business Travel Accident Benefit | $50,000 |
| Conference Cancellation | $25,000 |
| Donation Assurance | $50,000 |
| Emergency Real Estate Consulting Fee | $50,000 |
| Fundraising Event Blackout | $25,000 |
| Identity Theft Expense | $50,000 |
| Image Restoration and Counseling | $50,000 |
| Key Individual Replacement Expenses | $50,000 |
| Kidnap Expense | $50,000 |
| Political Unrest | $5,000 per employee: $25,000 policy limit |
| Temporary Meeting Space Reimbursement | $25,000 |
| Terrorism Travel Reimbursement | $50,000 |
| Travel Delay Reimbursement | $1,500 |
| Workplace Violence Counseling | $50,000 |

© 2009 Philadelphia Insurance Companies

DEFS-000087

II.    **CONDITIONS**

A.    **Applicability of Coverage**

Coverage provided by your policy and any endorsements attached thereto is amended by this endorsement where applicable.

B.    **Limits of Liability or Limits of Insurance**

1.    When coverage is provided by this endorsement and another coverage form or endorsement attached to this policy, the greater limits of liability or limits of insurance will apply.  In no instance will multiple limits apply to coverages which may be duplicated within this policy.  Additionally, if this policy and any other coverage part or policy issued to you by us, or any company affiliated with us, apply to the same occurrence, offense, wrongful act, accident or loss, the maximum limits of liability or limits of insurance under all such coverage parts or policies combined shall not exceed the highest applicable limits of liability or limits of insurance under any one coverage part or policy.

2.    Limits of liability or limits of insurance identified in Section **I. SCHEDULE OF ADDITIONAL COVERAGES AND LIMITS** above are not excess of, but are in addition to the applicable Limits of Liability or Limits of Insurance stated in the Declarations.

C.    **Claim Expenses**

Coverages provided herein are not applicable to the generation of claim adjustment costs by you; such as fees you may incur by retaining a public adjuster or appraiser.

III.    **ADDITIONAL COVERAGES**

A.    **Business Travel Accident Benefit**

We will pay a Business Travel Accident Benefit to the insured if a director or officer suffers injury or death while traveling on a common carrier for your business during the policy period.

For the purpose of Business Travel Accident Benefit coverage, injury means:

1.    Physical damage to the body caused by violence, fracture, or an accident that results in loss of life not later than one hundred eighty (180) days after the policy expiration, the date of cancellation or the date of non-renewal;

2.    Accidental loss of limbs or multiple fingers;

3.    Total loss of sight, speech or hearing.

The limit of insurance for this coverage is $50,000 per policy period for all insureds combined. No deductible applies to this coverage.

The Business Travel Accident Benefit shall not be payable if the cause of the injury was:

1.    An intentional act by the insured;

2.    An act of suicide or attempted suicide;

3.    An act of war; or

4.    A disease process.

© 2009 Philadelphia Insurance Companies

**B. Conference Cancellation**

We will reimburse the insured for any business-related conference expenses, paid by the insured and not otherwise reimbursed, for a canceled conference that an employee was scheduled to attend.  The cancellation must be due directly to a "natural catastrophe" or a "communicable disease" outbreak that forces the cancellation of the conference.

With respect to a conference cancellation claim, it is further agreed as follows:

**1.** The insured employee must have registered for the conference at least thirty (30) days prior to the cancellation; and

**2.** The cancellation must be ordered by a local, state or federal Board of Health or other governmental authority having jurisdiction over the location of the conference.

The limit of insurance for this coverage is $25,000 per policy period for all insureds combined. No deductible applies to this coverage.

**C. Donation Assurance**

If the insured is a 501(c)(3) status non-profit organization as defined in the United States Internal Revenue Code, we will reimburse the insured for "failed donation claim(s)."

With respect to any "failed donation claim," it is further agreed as follows:

**1.** The donor must not have been in bankruptcy, nor have filed for bankruptcy or reorganization in the past seven (7) years prior to the time said pledge was made to the insured;

**2.** For non-cash donations, our payment of a "failed donation claim" shall be based on the fair market value of said non-cash donation at the time of the "failed donation claim";

**3.** In the case of unemployment or incapacitation of a natural person donor and as a condition of payment of the "failed donation claim":

    **a.** Neither the natural person donor nor the insured shall have had reason to believe the donor would become unemployed or incapacitated subsequent to the donation date; and

    **b.** The donor shall be unemployed for at least sixty (60) days prior to a claim being submitted by the insured;

**4.** No coverage shall be afforded for a written pledge of funds or other measurable, tangible property to the insured dated prior to the policy period; and

**5.** A donation amount which is to be collected by the insured over more than a twelve (12) month period shall be deemed a single donation.

The limit of insurance for this coverage is $50,000 per policy period for all insureds combined. No deductible applies to this coverage.

**D. Emergency Real Estate Consulting Fee**

We will reimburse the insured any realtor's fee or real estate consultant's fee necessitated by the insured's need to relocate due to the "unforeseeable destruction" of the insured's "principal location" listed in the Declarations during the policy period.  The limit of insurance for this

DEFS-000089

PI-BELL-1 (11/09)

coverage is $50,000 per policy period for all insureds combined.  No deductible applies to this coverage.

**E.    Fundraising Event Blackout**

We will reimburse the insured for "fundraising expenses" that are incurred due to the cancellation of a fundraising event caused by the lack of electric supply resulting in a power outage, provided the fundraising event is not re-scheduled.  The fundraising event must have been planned at least thirty (30) days prior to the power outage.  The limit of insurance for this coverage is $25,000 per policy period for all insureds combined.  No deductible applies to this coverage.

**F.    Identity Theft Expense**

We will reimburse any present director or officer of the named insured for "identity theft expenses" incurred as the direct result of any "identity theft" first discovered and reported during the policy period; provided that it began to occur subsequent to the effective date of the insured's first policy with us.  The limit of insurance for this coverage is $50,000 per policy period for all insureds combined.  No deductible applies to this coverage.

**G.    Image Restoration and Counseling**

We will reimburse the insured for expenses incurred for image restoration and counseling arising out of "improper acts" by any natural person.

Covered expenses are limited to:

1.    The costs of rehabilitation and counseling for the accused natural person insured, provided the natural person insured is not ultimately found guilty of criminal conduct; this reimbursement to occur after acquittal of the natural person insured;

2.    The costs charged by a recruiter or expended on advertising, for replacing an officer as a result of "improper acts"; and

3.    The costs of restoring the named insured's reputation and consumer confidence through image consulting.

The limit of insurance for this coverage is $50,000 per policy period for all insureds combined.  No deductible applies to this coverage.

**H.    Key Individual Replacement Expenses**

We will pay "key individual replacement expenses" if the Chief Executive Officer or Executive Director suffers an "injury" during the policy period which results in the loss of life during the policy period.  The limit of insurance for this coverage is the lesser of $50,000 or ten (10) times the annual premium paid for this policy.  No deductible applies to this coverage.

**I.    Kidnap Expense**

We will pay on behalf of any director or officer of the insured, reasonable fees incurred as a result of the kidnapping of them or their spouse, "domestic partner," parent or child during the policy period.  Coverage will not apply to any kidnapping by or at the direction of any present or former family member of the victim.

Reasonable fees will include:

DEFS-000090

PI-BELL-1 (11/09)

1. Fees and costs of independent negotiators;

2. Interest costs for any loan from a financial institution taken by you to pay a ransom demand or extortion threat;

3. Travel costs and accommodations incurred by the named insured;

4. Reward money paid to an informant which leads to the arrest and conviction of parties responsible for loss covered under this insurance; and

5. Salary, commissions and other financial benefits paid by you to a director or officer.  Such compensation applies at the level in effect on the date of the kidnap and ends upon the earliest of:

   a. Up to thirty (30) days after their release, if the director or officer has not yet returned to work;

   b. Discovery of their death;

   c. One hundred twenty (120) days after the last credible evidence following abduction that they are still alive; or

   d. Twelve (12) months after the date of the kidnapping.

The limit of insurance for this coverage is $50,000 each policy period for all insureds combined.  No deductible applies to this coverage.

**J. Political Unrest Coverage**

We will reimburse any present director, officer, employee or volunteer of the named insured while traveling outside the United States of America for "emergency evacuation expenses" that are incurred as a result of an incident of "political unrest."  This "political unrest" must occur during the policy period.  No coverage is granted for travel to countries in a state of "political unrest" at the time of departure of the travel.  The limit of insurance for this coverage is $5,000 per covered person, subject to a maximum of $25,000 per policy period for all insureds combined.  No deductible applies to this coverage.

**K. Temporary Meeting Space Reimbursement**

We will reimburse the insured for rental of meeting space which is necessitated by the temporary unavailability of the insured's primary office space due to the failure of a climate control system, or leakage of a hot water heater during the policy period.  Coverage will exist only for the renting of temporary meeting space required for meeting with parties who are not insured under this policy.  The limit of insurance for this coverage is $25,000 per policy period for all insureds combined.  No deductible applies to this coverage.

**L. Terrorism Travel Reimbursement**

We will reimburse any present director or officer of the named insured in the event of a "certified act of terrorism" during the policy period which necessitates that he/she incurs "emergency travel expenses."  The limit of insurance for this coverage is $50,000 per policy period for all insureds combined.  No deductible applies to this coverage.

© 2009 Philadelphia Insurance Companies

DEFS-000091

**M. Travel Delay Reimbursement**

We will reimburse any present director or officer of the named insured for any "non-reimbursable expenses" they incur as a result of the cancellation of any regularly scheduled business travel on a common carrier.  The limit of insurance for this coverage is $1,500 per policy period for all insureds combined.  A seventy-two (72) hour waiting period deductible applies to this coverage.

**N. Workplace Violence Counseling**

We will reimburse the insured for emotional counseling expenses incurred directly as a result of a "workplace violence" incident at any of the insured's premises during the policy period.  The emotional counseling expenses incurred must have been for:

**1.** Your employees who were victims of, or witnesses to the "workplace violence";

**2.** The spouse, "domestic partner," parents or children of your employees who were victims of, or witnesses to the "workplace violence"; and

**3.** Any other person or persons who directly witnessed the "workplace violence" incident.

The limit of insurance for this coverage is $50,000 per policy period for all insureds combined.  No deductible applies to this coverage.

**IV.  DEFINITIONS**

For the purpose of this endorsement, the following definitions apply:

**A.** "Certified act of terrorism" means any act so defined under the Terrorism Risk Insurance Act, and its amendments or extensions.

**B.** "Communicable disease" means an illness, sickness, condition or an interruption or disorder of body functions, systems or organs that is transmissible by an infection or a contagion directly or indirectly through human contact, or contact with human fluids, waste, or similar agent, such as, but not limited to Meningitis, Measles or Legionnaire's Disease.

**C.** "Domestic partner" means any person who qualifies as a domestic partner under the provisions of any federal, state or local statute or regulation, or under the terms and provisions of any employee benefit or other program established by the named insured.

**D.** "Emergency evacuation expenses" mean:

**1.** Additional lodging expenses;

**2.** Additional transportation costs;

**3.** The cost of obtaining replacements of lost or stolen travel documents necessary for evacuation from the area of "political unrest"; and

**4.** Translation services, message transmittals and other communication expenses.

provided that these expenses are not otherwise reimbursable.

**E.** "Emergency travel expenses" mean:

© 2009 Philadelphia Insurance Companies

DEFS-000092

PI-BELL-1 (11/09)

    **1.** Hotel expenses incurred which directly result from the cancellation of a scheduled transport by a commercial transportation carrier, resulting directly from and within forty-eight (48) hours of a "certified act of terrorism"; and

    **2.** The increased amount incurred which may result from re-scheduling comparable transport, to replace a similarly scheduled transport canceled by a commercial transportation carrier in direct response to a "certified act of terrorism";

provided that these expenses are not otherwise reimbursable.

**F.** "Failed donation claim" means written notice to the insured during the policy period of:

    **1.** The bankruptcy or reorganization of any donor whereby such bankruptcy or reorganization prevents the donor from honoring a prior written pledge of funds or other measurable, tangible property to the insured; or

    **2.** The unemployment or incapacitation of a natural person donor preventing him/her from honoring a prior written pledge of funds or other measurable, tangible property to the insured.

**G.** "Fundraising expenses" mean deposits forfeited and other charges paid by you for catering services, property and equipment rentals and related transport, venue rentals, accommodations (including travel), and entertainment expenses less any deposits or other fees refunded or refundable to you.

**H.** "Identity theft" means the act of knowingly transferring or using, without lawful authority, a means of identification of any director or officer (or spouse or "domestic partner" thereof) of the named insured with the intent to commit, or to aid or abet another to commit, any unlawful activity that constitutes a violation of federal law or a felony under any applicable state or local law.

**I.** "Identity theft expenses" mean:

    **1.** Costs for notarizing affidavits or similar documents attesting to fraud required by financial institutions or similar credit grantors or credit agencies;

    **2.** Costs for certified mail to law enforcement agencies, credit agencies, financial institutions or similar credit grantors; and

    **3.** Loan application fees for re-applying for a loan or loans when the original application is rejected solely because the lender received incorrect credit information.

**J.** "Improper acts" means any actual or alleged act of:

    **1.** Sexual abuse;

    **2.** Sexual intimacy;

    **3.** Sexual molestation; or

    **4.** Sexual assault;

committed by an insured against any natural person who is not an insured. Such "improper acts" must have been committed by the insured while in his or her capacity as an insured.

**K.** "Injury" whenever used in this endorsement, other than in Section **III. A. Business Travel**,

DEFS-000093

PI-BELL-1 (11/09)

means any physical damage to the body caused by violence, fracture or an accident.

**L.** "Key individual replacement expenses" mean the following necessary expenses:

    **1.** Costs of advertising the employment position opening;

    **2.** Travel, lodging, meal and entertainment expenses incurred in interviewing job applicants for the employment position opening; and

    **3.** Miscellaneous extra expenses incurred in finding, interviewing and negotiating with the job applicants, including, but not limited to, overtime pay, costs to verify the background and references of the applicants and legal expenses incurred to draw up an employment contract.

**M.** "Natural catastrophe" means hurricane, tornado, earthquake or flood.

**N.** "Non-reimbursable expenses" means the following travel-related expenses incurred after a seventy-two (72) hour waiting period, beginning from the time documented on the proof of cancellation, and for which your director or officer produces a receipt:

    **1.** Meals and lodging;

    **2.** Alternative transportation;

    **3.** Clothing and necessary toiletries; and

    **4.** Emergency prescription and non-prescription drug expenses.

**O.** "Political unrest" means:

    **1.** A short-term condition of disturbance, turmoil or agitation within a foreign country that poses imminent risks to the security of citizens of the United States;

    **2.** A long-term condition of disturbance, turmoil or agitation that makes a foreign country dangerous or unstable for citizens of the United States; or

    **3.** A condition of disturbance, turmoil or agitation in a foreign country that constrains the United States Government's ability to assist citizens of the United States, due to the closure or inaccessibility of an embassy or consulate or because of a reduction of its staff

for which either an alert or travel warning has been issued by the United States Department of State.

**P.** "Principal location" means the headquarters, home office or main location where most business is substantially conducted.

**Q.** "Unforeseeable destruction" means damage resulting from a "certified act of terrorism," fire, collision or collapse which renders all of the insured's "principal locations" completely unusable.

**R.** "Workplace violence" means any intentional use of or threat to use deadly force by any person with intent to cause harm and that results in bodily "injury" or death of any person while on the insured's premises.

© 2009 Philadelphia Insurance Companies

DEFS-000094

PI-CME-1 (10/09)

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## CRISIS MANAGEMENT ENHANCEMENT ENDORSEMENT

Unless otherwise stated herein, the terms, conditions, exclusions and other limitations set forth in this endorsement are solely applicable to coverage afforded by this endorsement, and the policy is amended as follows:

Solely for the purpose of this endorsement:  1) The words  "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy.  2) The words "we," "us" and "our" refer to the company providing this insurance.

**I.    SCHEDULE OF ADDITIONAL COVERAGE AND LIMITS**

The following is the Limit of Liability provided by this endorsement.  This endorsement is subject to the provisions of the policy to which it is attached.

Crisis Management Expense                                                            $25,000

**II.    CONDITIONS**

**A.  Applicability of Coverage**

Coverage provided by your policy and any endorsements attached thereto is amended by this endorsement where applicable.  All other terms and conditions of the policy or coverage part to which this endorsement is attached remain unchanged.

**B.  Limits of Liability or Limits of Insurance**

When coverage is provided by this endorsement and any other coverage form or endorsement attached to this policy, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Liability or Limit of Insurance.

**C.  Claim Expenses**

Coverages provided herein are not applicable to the generation of claim adjustment costs by you; such as fees you may incur by retaining a public adjuster or appraiser.

**III.    ADDITIONAL COVERAGES**

**A.**  We will reimburse you for "crisis management emergency response expenses" incurred because of an "incident" giving rise to a "crisis" to which this insurance applies.  The amount of such reimbursement is limited as described in Section **II. CONDITIONS, B. Limits of Liability or Limits of Insurance**.  No other obligation or liability to pay sums or perform acts or services is covered.

**B.**  We will reimburse only those "crisis management emergency response expenses" which are incurred during the policy period as shown in the Declarations of the policy to which this coverage is attached and reported to us within six (6) months of the date the "crisis" was initiated.

DEFS-000095

PI-CME-1 (10/09)

## IV.   DEFINITIONS

**A.**   "Crisis" means the public announcement that an "incident" occurred on your premises or at an event sponsored by you.

**B.**   "Crisis management emergency response expenses" mean those expenses incurred for services provided by a "crisis management firm."  However, "crisis management emergency response expenses" shall not include compensation, fees, benefits, overhead, charges or expenses of any insured or any of your employees, nor shall "crisis management emergency response expenses" include any expenses that are payable on your behalf or reimbursable to you under any other valid and collectible insurance.

**C.**   "Crisis management firm" means any service provider you hire that is acceptable to us.  Our consent will not be unreasonably withheld.

**D.**   "Incident" means an accident or other event, including the accidental discharge of pollutants, resulting in death or serious bodily injury to three or more persons.

**E.**   "Serious bodily injury" means any injury to a person that creates a substantial risk of death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ.

DEFS-000096

PI-MANU-1 (01/00)

## **THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY**

DEFENSE ONLY WAGE & HOUR CARVEBACK with RETENTION

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

DEFENSE ONLY WAGE & HOUR CARVEBACK with RETENTION

This endorsement modifies insurance provided under the following:

PRIVATE COMPANY PROTECTION PLUS

1.    Part 2, EMPLOYMENT PRACTICES LIABILITY INSURANCE, Section III. EXCLUSIONS, paragraph B. is amended by adding the following sentence to the end thereof:

Notwithstanding the above, this exclusion shall not apply to Defense Cost incurred in the defense of any Claim for violation of the Fair Labor Standards Act (FLSA) or any similar federal, state, local or foreign statutory law or common law or regulation governing or related to wage and hour practices, including but not limited to, (i) any unfair business practices alleged because of the failure to pay Earned Wages, or (ii) seeking Earned Wages because any Employee(s) status was misclassified or mislabeled or (iii) any dispute involving the distribution or pooling of tip monies.  Coverage herewith in is subject to a Wage & Hour Sublimit of Defense Cost of $100,000.  This Wage & Hour Sublimit of Defense Cost shall be part of and not in addition to the Limit of Liability shown in Item 3. (B) of the Declarations.

However, no coverage provided herein shall be available for any Claim involving Employees employed at a location in the state of California.

It is further agreed and understood that coverage herewith in this endorsement is subject to a $25,000 Retention (hereinafter "Wage & Hour Retention").  The Underwriter shall only be liable for that portion of Defense Cost which is in excess of the Wage & Hour Retention.

For the purpose of this endorsement, Earned Wages means wage compensation or overtime pay for services rendered.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

All other terms and conditions of this Policy remain unchanged.

DEFS-000097

PI-MANU-1 (01/00)

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY**

All other terms and conditions of this Policy remain unchanged.

DEFS-000098

PI-MANU-1 (01/00)

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY

WORKPLACE VIOLENCE INSURANCE COVERAGE

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

WORKPLACE VIOLENCE INSURANCE COVERAGE

This endorsement modifies insurance provided under the following:

PRIVATE COMPANY PROTECTION PLUS

In consideration of the premium paid, the policy is amended to add the following coverage part:

Workplace Violence Insurance

(To be read in conjunction with the Common Policy Definitions, Exclusions, and Conditions Sections, Parts 4, 5, 6 of the policy to which this endorsement is attached.)

I.    INSURING AGREEMENTS

A.    The Underwriter will pay on behalf of the Private Company any Violence Damage, resulting from a Workplace Violence Act occurring during the Policy Period and reported to the Underwriter pursuant to the terms of this Policy.

II.    DEFINITIONS

A.    Violence Damage means:

1.    Business Interruption Expense

2.    Public Image Restoration Expense

3.    Workplace Violence Expense

B.    Business Interruption Expense means the amount calculated as set forth below for a period of time commencing on the day the Workplace Violence Act

All other terms and conditions of this Policy remain unchanged.

DEFS-000099

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY

occurs until the earlier of ninety (90) days following such date, or until the Private Company restores operations with due diligence and dispatch to the level that existed prior to the Workplace Violence Act:

1.    The sum of:

a.    net profits before income taxes that would have been earned had no Workplace Violence Act occurred; and

b.    the actual cost of continuing the activities which are necessary for the Private Company to resume operations with substantially the same quality of service which existed immediately preceding the Workplace Violence Act; and

c.    reasonable expenses which would not have been incurred except for such Workplace Violence Act and which were incurred by the Private Company for the sole purpose of reducing Business Interruption Expense described in B.1. (a or b) above, not to exceed the amount of actual reduction of such Business Interruption Expense; and

2.    Less the sum of all recoveries, other insurance, suretyship and other indemnity which cover Business Interruption Expense described in B.1. above.

C.    Public Image Restoration Expense means reasonable fees and expenses for, or cost of:

1.    an independent public relations consultant for up to ninety (90) days following the date the Workplace Violence Act occurs;

2.    an independent security consultant for up to ninety (90) days following the date the Workplace Violence Act occurs;

3.    a counseling seminar for Individual Insureds conducted by an independent consultant following the Workplace Violence Act;

4.    independent security guard service for up to thirty (30) days

All other terms and conditions of this Policy remain unchanged.

DEFS-000100

PI-MANU-1 (01/00)

## **THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY**

following the date the Workplace Violence Act occurs;

5.    an independent forensic analyst for up to ninety (90) days following
the date the Workplace Violence Act occurs;

D.    Workplace Violence Expense means the reasonable fees and expenses for,
or cost of:

1.    the Salary or Wages, for up to ninety (90) days following the date the
Workplace Violence Act occurs, that the Private Company pays Individual
Insureds victimized by  Workplace Violence Acts and unable to continue to
work because of such Workplace Violence Acts.  The Salary or Wages in effect
at the time of the Workplace Violence Act shall apply.

2.    the Salary or Wage, for up to ninety (90) days following the date the
Workplace Violence Act occurs, that the Private Company pays a newly hired
person(s) to conduct the duties of  Individual Insureds victimized by
Workplace Violence Acts and who is/are unable to continue to work because of
such Workplace Violence Acts; however such Salary or Wage shall not exceed
the Salary or Wage of the victimized Individual Insured in effect at the
time of the Workplace Violence Act.

E.    Workplace Violence Act means any actual or alleged intentional and
unlawful use of, or threat to use, deadly force with an intent to cause harm
at the Premises.

F.    Premises means any building, facility or property occupied by the
Private Company in conducting its operations.

G.    Salary or Wage means compensation the Private Company pays an
Individual Insured, including but not limited to bonus, commission,
incentive payments, and the cost of health, welfare and pension benefits.


III.    EXCLUSIONS

    The Underwriter shall not be liable under this coverage to make any
payment for Violence Damage:


All other terms and conditions of this Policy remain unchanged.

DEFS-000101

PI-MANU-1 (01/00)

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY

A.    arising out of, based upon or attributable to war, invasion, insurrection, riot, rebellion, revolution, civil war, or military action;

B.    arising out of, based upon or attributable to a Workplace Violence Act which occurs at any location other than the Premises;

C.    arising out of, based upon or attributable to the use or threat of force or violence occurring on the Premises for the purpose of demanding money, securities or property.

D.    arising out of, based upon or attributable to a Workplace Violence Act occurring prior to the Prior and Pending Date shown in Item 5 of the Declarations Page.

IV.    LIMIT OF LIABILITY AND RETENTION

For the purposes of this endorsement the Limit of Liability for claims for a Workplace Violence Act shall be $250,000. This limit shall be part of and not in addition to the Aggregate Limit of Liability shown in Item 3 (D) of the Declarations Page.

This Limit of Liability for claims for a Workplace Violence Act shall be subject to a retention of $5,000 per claim.

All other terms and conditions of this Policy remain unchanged.

All other terms and conditions of this Policy remain unchanged.

DEFS-000102

PI-MANU-1 (01/00)

## <u>THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY</u>

### Amended Bodily Injury / Property Damage Exclusion

Amended Bodily Injury / Property Damage Exclusion

This endorsement modifies and is subject to the insurance provided under the following:

Private Company Protection Plus

Part 5, COMMON POLICY EXCLUSIONS, Exclusion I. is deleted in its entirety and replaced by the following:

I. Arising out of, based upon or attributable to any actual or alleged bodily injury, mental anguish, emotional distress, sickness, disease or death of any person, or damage to or destruction of any tangible property including loss of use thereof; however, this exclusion shall not apply to mental anguish or emotional distress under Part 2 (Employment Practices Liability Insurance).

All other terms and conditions of this Policy remain unchanged.

DEFS-000103

PI-MANU-1 (01/00)

## **THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY**

ABUSE EXCLUSION WITH WORKPLACE HARASSMENT CARVEBACK

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.


ABUSE EXCLUSION WITH WORKPLACE HARASSMENT CARVEBACK


This endorsement modifies insurance provided under the following:

PRIVATE COMPANY PROTECTION PLUS


The Policy is amended as follows:


1.    The Underwriter shall not be liable to make any payment for Loss in connection with any Claim based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving the actual or alleged Abusive Acts of any person(s).


2.    The Underwriter shall not be liable to make any payment for Loss in connection with any Claim based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving the actual and/or alleged negligent hiring, retention, employment, assignment, placement, training, supervision, oversight, evaluation, assessment, discipline and/or investigation of any person(s) who actually or allegedly committed Abusive Acts.


For purposes of this Exclusion, Abusive Acts means any actual or alleged:


1.    Sexual abuse;
2.    Sexual harassment ;
3.    Sexual assault;
4.    Sexual molestation;
5.    Sexual exploitation;
6.    Physical abuse, harm, assault or battery; or
7.    Psychological or mental abuse or neglect


However, Parts 1. and 2. of this Exclusion shall not apply to the following:


All other terms and conditions of this Policy remain unchanged.

DEFS-000104

PI-MANU-1 (01/00)

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY

1.    Claims involving actual and/or alleged acts of harassment committed against an Individual Insured occurring in the workplace or in the course of employment or service with the Private Company.

2.    Claims involving an Insured's actual and/or alleged acts of harassment against a non-Insured person(s) in the course, scope or process of their application or interview for employment or service with the Private Company.

All other terms and conditions remain the same.

All other terms and conditions of this Policy remain unchanged.

DEFS-000105

PI-MANU-1 (01/00)

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY

IMMIGRATION CLAIM COVERAGE

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

IMMIGRATION CLAIM COVERAGE

This endorsement modifies and is subject to the insurance provided under the following:

PRIVATE COMPANY PROTECTION PLUS

1.   As a condition precedent to the coverage provided by this endorsement, Insured shall have adopted an employment verification system and shall adhere to the documentation requirements of the Federal Immigration and Nationality Act, 8 U.S.C. §1324a(b).  Insured agrees that failure to properly check employee documentation and to maintain evidence of the examination of said documentation as required by the Federal Immigration and Nationality Act, 8 U.S.C. §1324a(b), shall void coverage under this endorsement.

2.   With respect to coverage under Part 2, any Immigration Claim made against any Insured shall be subject to a $50,000 Immigration Sublimit of Liability.  This Immigration Sublimit of Liability is part of and not in addition to the Limit of Liability stated in Item 3(B) of the Declarations.

The Underwriter shall not have any obligation to pay any Loss arising out of any Immigration Claim once the $50,000 Immigration Sublimit of Liability has been exhausted.

3.   For the purposes of this endorsement only, Damages arising out of an Immigration Claim shall include civil fines and penalties.

4.   For the purposes of this endorsement only Immigration Claim means any civil complaint or proceeding based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving any actual or alleged violation of the Federal Immigration and Nationality Act, (8 U.S.C. §1324a) or any other Federal immigration law by any Insured.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

All other terms and conditions of this Policy remain unchanged.

DEFS-000106

CO-Disclosure (12-04)

# DISCLOSURE FORM
# CLAIMS-MADE POLICY

## COLORADO

### IMPORTANT NOTICE TO POLICYHOLDERS

**THIS DISCLOSURE FORM IS NOT YOUR POLICY. IT MERELY DESCRIBES SOME OF THE MAJOR FEATURES OF OUR CLAIMS-MADE POLICY FORM. PLEASE READ YOUR POLICY CAREFULLY TO DETERMINE RIGHTS, DUTIES, AND WHAT IS AND IS NOT COVERED. ONLY THE PROVISIONS OF YOUR POLICY DETERMINE THE SCOPE OF YOUR INSURANCE PROTECTION.**

**YOUR POLICY**

Your policy is a claims-made policy. It provides coverage only for injury or damage occurring after the policy retroactive date (if any) shown on your policy and the incident is reported to your insurer prior to the end of the policy period. Upon termination of your claims-made policy an extended reporting period option is available from your insurer.

There is no difference in the kind of injury or damage covered by occurrence or claims-made policies. Claims for damages may be assigned to different policy periods, depending on which type of policy you have.

If you make a claim under your claims-made policy, the claim must be a demand for damages by an injured party and does not have to be in writing. Under most circumstances, a claim is considered made when it is received and recorded by you or by us. Sometimes, a claim may be deemed made at an earlier time. This can happen when another claim for the same injury or damage has already been made, or when the claim is received and recorded during an extended reporting period.

**PRINCIPAL BENEFITS**

This policy provides for            MANAGEMENT LIABILITY            Coverage up to the maximum dollar limit specified in the policy.

The principal benefits and coverages are explained in detail in your claims-made policy. Please read it carefully and consult your insurance producer about any questions you might have.

**EXCEPTIONS, REDUCTIONS AND LIMITATIONS**

Your claims-made policy contains certain exceptions, reductions and limitations. Please read them carefully and consult your insurance producer about any questions you might have.

**RENEWALS AND EXTENDED REPORTING PERIODS**

Your claims-made policy has some unique features relating to renewal, extended reporting periods, and coverage for events with long periods of exposure.

If there is a retroactive date in your policy, no event or occurrence prior to that date will be covered under the policy even if reported during the policy period. It is therefore important for you to be certain that there are no gaps in your insurance coverage. These gaps can occur in several ways. Among the most common are:

1.      If you switch from an occurrence policy to a claims-made policy, the retroactive date in your claims-made policy should be no later than the expiration date of the occurrence policy.

DEFS-000107

CO-Disclosure (12-04)

2.    When replacing a claims-made policy with a claims-made policy, you should consider the following:

      a.    The retroactive date in the replacement policy should extend far enough back in time to cover any events with long periods of liability exposure, or

      b.    If the retroactive date in the replacement policy does not extend far enough back in time to cover events with long periods of liability exposure, you should consider purchasing extended reporting period coverage under the old claims-made policy.

3.    If you replace this claims-made policy with an occurrence policy, you may not have insurance coverage for a claim arising during the period of claims-made coverage unless you have purchased an extended reporting period under the claims-made policy.  Extended reporting period coverage must be offered to you by law for at least one year after the expiration of the claims-made policy at a premium not to exceed 200% of your last policy premium.

**CAREFULLY REVIEW YOUR POLICY REGARDING THE AVAILABLE EXTENDED REPORTING PERIOD COVERAGE, INCLUDING THE LENGTH OF COVERAGE, THE PRICE AND THE TIME PERIOD DURING WHICH YOU MUST PURCHASE OR ACCEPT ANY OFFER FOR EXTENDED REPORTING PERIOD COVERAGE.**

DEFS-000108

PI-PRD-2 (09/02)

# PRIVATE COMPANY PROTECTION PLUS
Directors and Officers & Private Company Liability Insurance
Employment Practices Liability Insurance
Fiduciary Liability Insurance

In consideration of the premium paid and in reliance upon all statements made and information furnished to the **Underwriter**, including all statements made in the **Application**, the **Underwriter** agrees to provide coverage as shown in the Declarations and described as follows:

**PART 1**
**DIRECTORS & OFFICERS LIABILITY INSURANCE**

(To be read in conjunction with the Common Policy Definitions, Exclusions and Conditions Sections, Part 4, 5, 6 below)

I.    INSURING AGREEMENTS

    A.    INDIVIDUAL LIABILITY COVERAGE

        The **Underwriter** shall pay on behalf of the **Individual Insured**, **Loss** from **Claims** made against **Individual Insureds** during the **Policy Period** (or, if applicable, during the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for **D&O Wrongful Acts**, except to the extent the **Private Company** has indemnified the **Individual Insured** for such **Loss**.

    B.    PRIVATE COMPANY INDEMNITY COVERAGE

        The **Underwriter** shall pay on behalf of the **Private Company**, **Loss** from **Claims** made against **Individual Insureds** during the **Policy Period** (or, if applicable, during the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for **D&O Wrongful Acts**, if the **Private Company** has indemnified such **Individual Insureds** for such **Loss**.

    C.    PRIVATE COMPANY LIABILITY COVERAGE

        The **Underwriter** shall pay on behalf of the **Private Company**, **Loss** from **Claims** made against the **Private Company** during the **Policy Period** (or, if applicable, during the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for a **D&O Wrongful Act**.

II.    DEFINITIONS

    A.    **D&O Wrongful Act** means any actual or alleged:

        1.    act, error, omission, misstatement, misleading statement, neglect, or breach of duty committed or attempted by an **Individual Insured** in his/her capacity as an **Individual Insured**; or

        2.    act, error, omission, misstatement, misleading statement, neglect, or breach of duty committed or attempted by the **Private Company**; or

        3.    act, error, omission, misstatement, misleading statement, neglect, or breach of duty committed or attempted by an **Individual Insured** arising out of serving in his/her capacity as a director, officer, governor or trustee of an **Outside Entity**, but only:

DEFS-000109

PI-PRD-2 (09/02)

    a.  if such service is at the written request or direction of the **Private Company**; and

    b.  if, at the time such service began, the **Individual Insured** did not know or could not have reasonably foreseen that such act, error, omission, misstatement, misleading statement, neglect, or breach of duty could lead to a **Claim** under this Policy.

B.  **Outside Entity** means:

    1.  any not-for-profit entity described in section 501(c)(3) of the Internal Revenue Code of 1986 (as amended); or

    2.  any other entity listed as an **Outside Entity** in an endorsement to this Policy.

III.    EXCLUSIONS

The **Underwriter** shall not be liable under this Part 1 to make any payment for **Loss** in connection with any **Claim** made against the **Private Company** under Insuring Agreement C:

A.  arising out of, based upon or attributable to any actual or alleged plagiarism, infringement of copyright, patent, trademark, trade name, trade dress, service mark, title or slogan, piracy or misappropriation of ideas or trade secrets;

B.  arising out of, based upon or attributable to any actual or alleged price fixing, restraint of trade, monopolization, unfair competition, or violation of the Federal Trade Commission Act, the Sherman Anti-Trust Act, the Clayton Act, the Robinson-Patman Act, the Hart-Scott-Rodino Anti-Trust Improvement Act or any other similar federal, state, or local statutory provision or common law anywhere in the world;

C.  for any actual or alleged liability under any written or oral contract or agreement; however, this exclusion does not apply to any of the following:

    1.  liability of the **Private Company** which would have attached even in the absence of such contract or agreement; or

    2.  **Defense Costs**.

D.  arising out of, based upon or attributable to any failure to comply with any law concerning workers compensation, unemployment insurance, social security, disability benefits or any similar laws;

E.  for any actual or alleged violation of any of the responsibilities, obligations, or duties imposed by ERISA, the National Labor Relations Act (including the Labor Management Relations Act of 1947), Fair Labor Standards Act, Occupational Safety and Health Act, Consolidated Omnibus Budget Reconciliation Act of 1985, Worker Adjustment and Retraining Notification Act; or any amendments to or rules, regulations or orders promulgated pursuant to these laws, or similar provisions of any federal, state or local statutory or common law;

F.  for any actual or alleged malfunction of any product or failure of any product to perform in any manner as a result of any defect, deficiency, inadequacy or dangerous condition in such product or in its design or manufacture;

G.  arising out of, based upon or attributable to an **Employment Practices Act** or a **Fiduciary Liability Act**.

DEFS-000110

PI-PRD-2 (09/02)

IV. PRESUMPTIVE INDEMNIFICATION

If the **Private Company** is permitted or required by common or statutory law, but fails to indemnify the **Individual Insured** for **Loss** (except by reason of its financial insolvency), any payment by the **Underwriter** of such **Loss** shall be subject to the Insuring Agreement C Retention Amount set forth in Item 4.(A) of the Declarations. The charter, by-laws, shareholder and board of director's resolutions of the **Private Company** shall be deemed to provide indemnification for such **Loss** to the fullest extent permitted by law.

<u>**PART 2**</u>
**EMPLOYMENT PRACTICES LIABILITY INSURANCE**

(To be read in conjunction with the Common Policy Definitions, Exclusions and Conditions Sections, Part 4, 5, 6 below)

I. INSURING AGREEMENT

The **Underwriter** shall pay on behalf of the **Insured**, **Loss** from **Claims** made against the **Insured** during the **Policy Period** (or, if applicable, the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for an **Employment Practice Act**.

II. DEFINITIONS

   A. **Employment Practice Act** means any actual or alleged:

      1. wrongful dismissal, discharge or termination of employment;

      2. breach of a written or oral employment contract or implied employment contract;

      3. employment related misrepresentation;

      4. wrongful failure to promote;

      5. violation of employment discrimination laws (including harassment);

      6. wrongful deprivation of a career opportunity;

      7. employment related wrongful discipline;

      8. negligent employee evaluation;

      9. employment related invasion of privacy;

      10. employment related defamation (including libel and slander);

      11. sexual or workplace harassment of any kind;

      12. constructive discharge of employment;

      13. employment related **Retaliation**;

      14. employment related humiliation;

      15. wrongful demotion;

      16. negligent reassignment;

      17. violation of any federal, state or local civil rights laws;

and committed or attempted by an **Individual Insured** in his/her capacity as an **Individual Insured** or by the **Private Company**.

Solely with respect to any **Claim** brought by or on behalf of any **Third Party**, **Employment Practice Act** means any actual or alleged wrongful failure to employ, discrimination, sexual

DEFS-000111

PI-PRD-2 (09/02)

harassment or violation of such **Third Party's** civil rights in relation to such wrongful failure to employ, discrimination or sexual harassment, whether direct, indirect, or unintentional, committed by an **Individual Insured** in his/her capacity as an **Individual Insured** or by the **Private Company**.

B. **Retaliation** means retaliatory treatment against an **Individual Insured** on account of such individual:

    1. exercising his or her rights under law, including but not limited to rights under any workers compensation laws, the Family and Medical Leave Act, or the Americans with Disabilities Act;

    2. refusing to violate any law;

    3. having assisted or testified in or cooperated with a proceeding or investigation regarding alleged violations of law by the **Insured**;

    4. disclosing in writing to a superior or to any governmental agency any alleged violations of law;

    5. filing any claim against the **Insured** under the Federal False Claims Act or any other similar "whistle blower" federal, state, or local law.

C. **Third Party** means any natural person who is an active or current customer, supplier, vendor, applicant, business invitee or other client of the **Private Company**.

III. EXCLUSIONS

The **Underwriter** shall not be liable under this Part 2 to make any payment for **Loss** in connection with any **Claim** made against the **Insured**:

A. arising out of, based upon or attributable to any failure to comply with any law concerning workers compensation, unemployment insurance, social security, disability benefits or any similar laws; however, this exclusion shall not apply to any **Claim** for **Retaliation**;

B. for any actual or alleged violation of any of the responsibilities, obligations, or duties imposed by ERISA, the National Labor Relations Act (including the Labor Management Relations Act of 1947), Fair Labor Standards Act (except the Equal Pay Act ), Occupational Safety and Health Act, Consolidated Omnibus Budget Reconciliation Act of 1985, Worker Adjustment and Retraining Notification Act; or any amendments to or rules, regulations or orders promulgated pursuant to these laws, or similar provisions of any federal, state or local statutory or common law; however, this exclusion shall not apply to any **Claim** for **Retaliation**;

C. arising out of, based upon or attributable to a lockout, strike, picket line, replacement or other similar action resulting from labor disputes, labor negotiations, or collective bargaining agreements; provided that this exclusion will not apply to any **Claim** for **Retaliation**;

D. arising out of, based upon or attributable to obligations or payments owed under (i) an express (written or verbal) contract of employment, (ii) an agreement to make payments in the event of the termination of employment, or (iii) an agreement to assume another's liability; however, this exclusion does not apply to any of the following:

    1. liability of the **Private Company** which would have attached even in the absence of such contract or agreement; or

DEFS-000112

PI-PRD-2 (09/02)

      2.    **Defense Costs**;

E.  to the extent such **Loss**, other than **Defense Costs**, constitutes employment-related benefits, stock options, perquisites, deferred compensation, payment of insurance, or any other type of compensation earned by the claimant in the course of employment or the equivalent value thereof; however, this exclusion shall not apply to front pay or back pay;

F.  arising out of, based upon or attributable to a **D&O Wrongful Act** or a **Fiduciary Liability Act**.

## PART 3
## FIDUCIARY LIABILITY INSURANCE

*(To be read in conjunction with the Common Policy Definitions, Exclusions and Conditions Sections, Part 4, 5, 6 below)*

I.   INSURING AGREEMENT

The **Underwriter** shall pay on behalf of the **Insured**, **Loss** from **Claims** made against the **Insured** during the **Policy Period** (or, if applicable, the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for a **Fiduciary Liability Act**.

II.  DEFINITIONS

A.  **Administration** means:  (i) giving counsel to **Employees**, beneficiaries or participants regarding any **Benefit Plan**, (ii) providing interpretations and handling records in connection with any **Benefit Plan**, or (iii) effecting enrollment, termination or cancellation of **Employees** or participants under any **Benefit Plan**.

B.  **Benefit Plan** means:

    1.  any **Welfare Benefit Plan** which was, is now or becomes sponsored by the **Private Company** solely for the benefit of the **Employees** of the **Private Company**;

    2.  any **Pension Benefit Plan** which was, on or prior to the effective date of this Policy, sponsored by the **Private Company** solely for the benefit of the **Employees** of the **Private Company**, provided that coverage was available in respect of such **Pension Benefit Plan** under any policy of which this Policy is a renewal or replacement and such **Pension Benefit Plan** has been reported in writing to the **Underwriter** as part of the **Application**;

    3.  any **Pension Benefit Plan** created or acquired (through merger, consolidation or otherwise) during the **Policy Period** by the **Insured** solely for the benefit of the **Employees** of the **Private Company**, but only upon the condition that within 90 days after such creation or acquisition, the **Insured** shall have (i) provided written notice to the **Underwriter** of such newly created **Pension Benefit Plan**, and (ii) agreed to any additional terms and paid any additional premium required by the **Underwriter** in its sole discretion;

    4.  any government-mandated benefit program for workers compensation, unemployment, social security or disability benefit for **Employees** of the **Private Company**.

However, **Benefit Plan** does not include any multi-employer plan.

Coverage for **Benefit Plans** which are sold, terminated or spun-off during or prior to the **Policy Period** shall apply only with respect to any **Fiduciary Liability Act** occurring prior to the date

DEFS-000113

of such sale or spin-off, or in the case of termination, prior to the final date of asset distribution of such **Benefit Plan**.

C.  **Fiduciary Liability Act** means any actual or alleged:

1.  breach by an **Insured** of the responsibilities, obligations or duties imposed upon fiduciaries of any **Benefit Plan** by **ERISA**; or

2.  negligent act, error or omission by an **Insured** solely in the **Administration** of any **Benefit Plans**.

D.  **Pension Benefit Plan** means any employee pension benefit plan, as defined in **ERISA**.

E.  **Welfare Benefit Plan** means any employee welfare benefit plan, as defined in **ERISA.**

III.  EXCLUSIONS

The **Underwriter** shall not be liable under this Part 3 to make any payment for **Loss** in connection with any **Claim** made against the **Insured**:

A.  arising out of, based upon or attributable to the actual or alleged failure to collect or fund contributions owed to any **Benefit Plan**; or for the return or reversion to any employer of any contribution to or asset of a **Benefit Plan**;

B.  to the extent such **Loss** constitutes benefits due or to become due under a **Benefit Plan** or benefits which would be due under a **Benefit Plan** if its terms complied with all applicable law; however, this exclusion shall not apply to **Defense Costs**;

C.  arising out of, based upon or attributable to any failure or omission to effect and maintain insurance or bonding for the property or assets of any **Benefit Plan**;

D.  arising out of, based upon or attributable to any liability of others assumed by the **Insured** under any contract or agreement, other than any contract or agreement establishing a **Benefit Plan**.

E.  arising out of, based upon or attributable to any failure to comply with any law concerning workers   compensation, unemployment insurance, social security, disability benefits or any similar laws;

F.  arising out of, based upon or attributable to an **Employment Practices Act** or a **D&O Wrongful Act**.

DEFS-000114

**PART 4**
**COMMON POLICY DEFINITIONS**

A. **Application** means:

    1. the **Application** for this Policy, including any material submitted therewith; and

    2. the **Application**(s), including any material submitted therewith, for all previous policies issued by the **Underwriter** of which this Policy is a direct or indirect renewal or replacement,

    all of which shall be deemed a part of this Policy as if physically attached hereto.

B. **Claim** means:

    1.     a written demand for monetary or non-monetary relief;

    2.     a judicial or civil proceeding commenced by the service of a complaint or similar pleading;

    3.     a criminal proceeding commenced by a return of an indictment;

    4.     a formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigation order or similar document, including, but not limited to, proceedings before the Equal Employment Opportunity Commission or any similar governmental agency;

    5.     an arbitration or mediation or other alternative dispute resolution proceeding if the **Insured** is obligated to participate in such proceeding or if the **Insured** agrees to participate in such proceeding, with the **Underwriter's** written consent, such consent not to be unreasonably withheld;

    6.     solely with respect to Part 3 (Fiduciary Liability Insurance), a written notice of commencement of an investigation by the Department of Labor or the Pension Benefit Guaranty Corporation;

    against an **Insured** for a **Wrongful Act**, including any appeal therefrom; or

    7.     a written request received by an **Insured** to toll or waive a statute of limitations, relating to a potential **Claim** as described above.

    However, **Claim** shall not include a labor or grievance proceeding pursuant to a collective bargaining agreement.

    A c**laim** shall be considered made when an **Insured** first receives notice of the **Claim**.

C. **Damages** means any monetary judgment (including any pre- and post- judgment Interest thereon) or monetary settlement, including the punitive, exemplary or multiple portion of any judgment (to the extent such damage is insurable under law of any jurisdiction which has a substantial relationship to the **Insured** or to the **Claim** seeking such damage and which is most favorable to the insurability of such damage).

D. **Defense Cost**s means:

DEFS-000115

PI-PRD-2 (09/02)

1. any reasonable and necessary legal fees and expenses incurred in the defense of a **Claim,** whether by the **Insured** with the **Underwriter's** consent or directly by the **Underwriter**, in the investigation, adjustment, defense and appeal of a **Claim,** except that **Defense Costs** shall not include:

   a. any amounts incurred in defense of any **Claim** for which any other insurer has a duty to defend, regardless of whether or not such other insurer undertakes such duty; or

   b. salaries, wages, overhead or benefit expenses associated with any **Insured** except as specified in subparagraph 2. below; or

   c. salaries, wages, overhead or benefit expenses associated with employees of the **Underwriter**; and

2. a $250 per day per **Individual Insured** supplemental payment for the attendance at the request or with the consent of the **Underwriter** by such **Individual Insured** at hearings, trials or depositions. Such payment shall not exceed $5000 in the aggregate for all **Individual Insureds** in each **Claim**.

E. **Employee** means any natural person whose labor or service is engaged by and directed by the **Private Company**, including part-time, seasonal, leased and temporary employees as well as volunteers, but only while that natural person is acting in his or her capacity as such. **Employee** shall not include any independent contractors, unless specifically scheduled by endorsement.

F. **ERISA** means the Employee Retirement Income Security Act of 1974, as amended, any similar federal, state, local or common law, and any rules and regulations promulgated thereunder.

G. **Individual Insured** means:

   1. any individual who has been, now is or shall become a director, officer, governor, trustee, **Employee**, volunteer, management committee member, or member of the Board of Managers of the **Private Company** or, solely with respect to Part 3 (Fiduciary Liability Insurance), a director, officer, governor, trustee or **Employee** of any **Benefit Plan**;

   2. the lawful spouse of a director, officer, governor, trustee, or equivalent executive of the **Private Company**, but only for actual or alleged **Wrongful Acts** of such person for which such spouse may be liable as the spouse of such person;

   3. the estate, heirs, legal representatives or assigns of a deceased director or officer, or the legal representatives or assigns of such a person who is incompetent, but only for **Wrongful Acts** of the person described in G. (1) or (4) which, in the absence of such death or incompetence, would have been covered by this Policy;

   4. with respect to a **Private Company** chartered outside the United States of America, any individual who has been, now is or shall become a person serving in a position with such **Private Company** that is equivalent to any position described in (1) above.

H. **Insured** means the **Private Company** and **Individual Insured**.

DEFS-000116

I. **Interrelated Wrongful Act** means: any causally connected **Wrongful Act** or any series of the same, similar or related **Wrongful Acts**.

J. **Loss** means:

    1.    **Damages**;

    2.    **Defense Costs**;

but **Loss** does not include:

    1.    criminal or civil fines or penalties imposed by law except that solely with respect to Part 3 (Fiduciary Liability Insurance) **Loss** includes fines or penalties imposed under Section 502 (i) and (l) of **ERISA**; or

    2.    taxes; or

    3.    matters deemed uninsurable under the law to which this Policy shall be construed; or

    4.    any amounts other than **Defense Costs**, which an **Insured** is obligated to pay as a result of a **Claim** seeking relief or redress in any form other than monetary damages; or

    5.    any costs other than **Defense Costs** associated with any accommodation required pursuant to the American With Disabilities Act (removed Civil Rights Act of 1964) and the rules or regulations promulgated thereunder, amendments thereto, or similar provisions of any federal, state or local law or common law.

K. **Named Corporation** means the first entity named in Item 1 of the Declarations Page.

L. **Private Company** means:

    1. the **Named Corporation**, and

    2. any **Subsidiary**, and

    3. any entity or person as a debtor in possession within the meaning of the United States Bankruptcy Code or similar legal status under foreign law, and

    4. solely with respect to Part 3 (Fiduciary Liability Insurance), any **Benefit Plan**.

M. **Policy Period** means the period of time specified in Item 2 of the Declarations Page.

N. **Private Offering** means securities offered or issued by the **Private Company** which are exempt from registration with the United States Securities and Exchange Commission pursuant to Section 3 (b) of the Securities Act of 1933.

O. **Public Offering** means securities issued by the **Private Company** for initial public offering, public sale, public solicitation or public distribution to the general public and which is subject to full registration with the United States Securities & Exchange Commission (SEC). **Public Offering** does not include a **Private Offering**.

P. **Run-Off Policy** means a new policy of insurance offered by the **Underwriter** at the request of the **Named Corporation** in the event of a **Transaction**. The **Run-Off Policy** shall apply to

PI-PRD-2 (09/02)

**Claims** made and reported to the **Underwriter** during the term of the **Run-Off Policy**, but only for **Wrongful Acts** occurring prior to the effective date of said **Transaction**.

Q. **Subsidiary** means:

    1. a corporation of which the **Named Corporation** owns on or before the inception of the **Policy Period** more than 50% of the issued and outstanding voting stock either directly, or indirectly through one or more of its **Subsidiaries** or the right to elect, appoint or designate more than 50% of such entity's **board** of directors, trustees, or managers and which is set forth in the **Application**;

    2. a corporation which becomes a **Subsidiary** during the **Policy Period** and whose assets total less than 25% of the total consolidated assets of the **Named Corporation** as of the inception date of this **Policy Period**. The **Named Corporation** shall provide the **Underwriter** with full particulars of the new **Subsidiary** before the end of the **Policy Period**;

    3. a corporation, which becomes a **Subsidiary** during the **Policy Period** other than a corporation described in paragraph 2. above, but only upon the condition that within 90 days of its becoming a **Subsidiary**, the **Named Corporation** shall have provided the **Underwriter** with full particulars of the new **Subsidiary** and agreed to any additional premium and/or amendment of the provisions of this Policy required by the **Underwriter** relating to such new **Subsidiary**. Further, coverage as shall be afforded to the new **Subsidiary** is conditioned upon the **Named Corporation** paying when due any additional premium required by the **Underwriter** relating to such new **Subsidiary**.

    A corporation becomes a **Subsidiary** when the **Named Corporation** owns more than 50% of the issued and outstanding voting stock, either directly, or indirectly through one or more of its **Subsidiaries**. A corporation ceases to be a **Subsidiary** when the **Named Corporation** ceases to own more than 50% of the issued and outstanding voting stock, either directly, or indirectly through one or more of its **Subsidiaries**. Coverage for **Claims** made against any **Subsidiary** or the **Individual Insureds** of any **Subsidiary** shall only apply to **Wrongful Acts** of such **Subsidiary** or the **Individual Insureds** of such **Subsidiary** occurring after the effective time that such **Subsidiary** became a **Subsidiary** and prior to the time that such **Subsidiary** ceased to be a **Subsidiary**.

R. **Transaction** shall mean:

    1 the **Private Company** merging into or consolidating with another entity such that the other entity is the surviving entity; or

    2. another entity, or person or group of entities and/or persons acting in concert acquiring securities or   voting rights which result in ownership or voting control by the other entity(ies) or person(s) of more     than 50% of the outstanding securities representing the present right to vote for the election of directors of the **Private Company**; or

    3. **Public Offering**.

S. **Underwriter** means the stock insurance company check marked on the Declarations Page of this Policy.

T. **Wrongful Act** means:

DEFS-000118

    1.    with respect to Part 1, any **D&O Wrongful Act**,

    2.    with respect to Part 2, any **Employment Practice Act**,

    3.    with respect to Part 3, any **Fiduciary Liability Act**.

## PART 5
## COMMON POLICY EXCLUSIONS

The **Underwriter** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against the **Insured**:

A.    arising out of, based upon or attributable to such **Insured** gaining any profit, remuneration or advantage to which they were not legally entitled; however, this exclusion shall only apply if a final and non-appealable judgment or adjudication establishes the **Insured** committed such act or omission;

B.    arising out of, based upon or attributable to any dishonest or fraudulent act or omission or any criminal act or omission by such **Insured**; however, this exclusion shall only apply if a final and non-appealable judgment or adjudication establishes the **Insured** committed such act or omission;

No **Wrongful Act** of any **Insured** shall be imputed to any other **Individual Insured** for purpose of determining the applicability of Exclusions A and B above.

C.    arising out of, based upon or attributable to the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials, or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water, or any cost or expense arising out of any governmental direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize any pollutants;

D.    arising out of, based upon or attributable to any bodily injury or property damage in connection with tobacco smoke, asbestos or mold including, without limitation, the use, exposure, presence, existence, detection, removal, elimination or avoidance of tobacco smoke, asbestos or mold to any persons and in any environment, building or structure;

E.    arising out of, based upon or attributable to the radioactive, toxic, or explosive properties of nuclear material which includes, but is not limited to, Source Material, Special Nuclear Material and Byproduct Material as those terms are defined in the Atomic Energy Act of 1954 and any amendments thereto and any similar provisions of any federal, state or local statutory or common law;

F.    arising out of, based upon or attributable to:

    1.    any litigation or demand against an **Insured** pending on or before the respective Prior and Pending Date set forth in Item 5 of the Declarations Page, or the same or essentially the same facts as alleged in such prior litigation; or

    2.    any **Wrongful Act**, fact, circumstance or situation which has been the subject of any written notice given under any other policy of insurance prior to inception of this Policy; or

    3.    any **Wrongful Act**, fact, circumstance or situation of which, as of the respective Prior and Pending Date set forth in Item 5 of the Declarations Page, the **Insured** had knowledge and from which the **Insured** could reasonably expect a **Claim** to arise.

PI-PRD-2 (09/02)

G.     arising out of, based upon or attributable to the insolvency, conservatorship, receivership, bankruptcy or liquidation of any bank, banking firm, broker, dealer, investment company, investment banker, insurance company, or other entity of a similar nature; or the failure to pay or suspension of payment by any such entity;

H.     to the extent such **Loss** constitutes **Defense Costs** in a **Claim** directly or indirectly by, on behalf of, or for the benefit of any insurance carrier or bond carrier of the **Insured** or any affiliate of the **Insured**, regardless of in whose name such **Claim** is actually made;

I.     for any actual or alleged bodily injury, mental anguish, emotional distress, sickness, disease or death of any person, or damage to or destruction of any tangible property including **Loss** of use thereof; however, this exclusion shall not apply to mental anguish or emotional distress under Part 2 (Employment Practices Liability Insurance);

J.     brought or maintained by or on behalf of, or in the right of, the **Private Company** except a derivative action **Claim** by any person who is not a past or present director, officer, governor, trustee, equivalent executive, management committee member, or member of the Board of Managers of the **Private Company** and who brings or maintains the **Claim** without the solicitation, assistance or participation of such persons; provided, however that this exclusion shall not apply to a **Claim** brought or maintained by or on behalf of a bankruptcy or insolvency receiver, trustee, examiner, conservator, liquidator or rehabilitator for the **Private Company**, or any assignee of such receiver, trustee, examiner, conservator, liquidator or rehabilitator;

K.     brought or maintained by any **Individual Insured** except:

    1.   any **Claim** in the form of a cross claim, third party claim or other claim for contribution or indemnity by an **Individual Insured** which is part of or results directly from a **Claim** which is not otherwise excluded by this Policy;

    2.   a **Claim** for an **Employment Practice Act** or a **Fiduciary Liability Act**;

    3.   a **Claim** for a **D&O Wrongful Act** brought or maintained by an **Employee**(s) who is not a past or present  director, officer, governor, trustee, equivalent executive, management committee member, or member of the Board of Managers of the **Private Company** if such **Claim** for a **D&O Wrongful Act** is brought and maintained by such **Employee** without the assistance, participation or solicitation of any such persons.

L.     for a **Wrongful Act** committed or attempted by a **Subsidiary**, **Benefit Plan** or an **Individual Insured** of a **Subsidiary** or **Benefit Plan** before such entity or plan became an **Insured** or after the entity or plan ceased to be an **Insured**;

M.     for service by the **Individual Insured** in any position or capacity in any entity other than the **Private Company**, a **Benefit Plan** or an **Outside Entity**, even if the **Private Company** directed or requested the **Individual Insured** to serve in such other position or capacity;

N.     arising out of, based upon or attributable to a **Public Offering** or any violation of the Securities and Exchange Act of  1933, Securities and Exchange Act of 1934, Investment Act of 1940, any state "Blue Sky" securities law, or any other federal, state or local securities law or any amendments thereto or any rules or regulations promulgated thereunder or any other provision of statutory or common law used to impose liability in connection with the offer to sell or purchase, or the actual sale or purchase of securities; provided, however that this exclusion shall not apply:

    1.   to any **Private Offering**, subject to terms and conditions of Part 6, Section XVII;

DEFS-000120

PI-PRD-2 (09/02)

2.   to any **Claim** made by any securityholder of the **Private Company** for the failure of the **Insured** to undertake or complete a **Public Offering**.

**PART 6**
**COMMON POLICY CONDITIONS**

I.    LIMITS OF LIABILITY

Regardless of the number of **Insureds** involved, **Claims** made, the **Underwriter's** liability under the Policy is limited as follows:

A.    With respect to coverage under Part 1 of this Policy, the **Underwriter's** maximum aggregate liability under Part 1 for all **Loss** on account of all **Claims** made during the **Policy Period**, whether covered under Insuring Agreement A, B or C, shall be the Limit of Liability for each **Policy Period** as set forth in Item 3.(A) of the Declarations.

B.    With respect to coverage under Part 2 and Part 3 of this Policy, the **Underwriter's** maximum aggregate liability for all **Loss** on account of all **Claims** made during the **Policy Period** shall be the Limit of Liability for each **Policy Period** as set forth in Item 3.(B) and 3.(C), respectively, of the Declarations.

C.    The **Underwriter's** maximum aggregate liability for all **Loss** on account of all **Claims** first made during the **Policy Period** under all purchased Parts, combined, shall be the Aggregate Limit of Liability set forth in Item 3.(D) of the Declarations.  The Limits of Liability set forth in Item 3.(A), 3.(B), and 3.(C),  are sub-limits that do not increase the **Underwriter's** maximum liability as set forth in Item 3.(D).

D.    **Defense Costs** are part of the Limit of Liability specified in Item 3. of the Declarations.  Payment by the **Underwriter** of **Defense Costs** incurred on account of any **Claim** shall serve to reduce the Limit of Liability stated in Item 3. of the Declarations.  The **Underwriter** is not obligated to pay any **Loss** after the applicable Limit of Liability has been exhausted.

E.    The Limit of Liability for any Extension Period, if applicable, shall be a part of and not in addition to the respective Limit of Liability applicable to the **Policy Period**.

II.   RETENTION CLAUSE

The **Underwriter** shall only be liable for that portion of **Loss** arising from each **Claim** which is in excess of the respective Retention stated in Item 4. of the Declarations Page.  Such Retention shall be borne by the **Insured**, uninsured and at their own risk, provided no Retention shall apply to **Loss** incurred by **Individual Insureds** for which the **Private Company** is not permitted or required to indemnify the **Individual Insured** or is financially unable to do so.  A single Retention shall apply to **Loss** arising from all **Claims** alleging **Interrelated Wrongful Acts**.

III.  DEFENSE AND SETTLEMENT

A.    The **Insured** and not the **Underwriter** shall have the responsibility to defend any **Claim.** However, the **Insured** shall have the right, as soon as practicable after a **Claim** is first made, to tender the defense of such **Claim** to the **Underwriter**.  Upon written notice to the **Underwriter** of such election by the **Insured** and subject to all of the provisions of this Section III. DEFENSE  AND SETTLEMENT, the **Underwriter** shall undertake and manage the defense of such **Claim**, even if such **Claim** is groundless, false or fraudulent.

DEFS-000121

B.     If the **Insured** is defending a **Claim** pursuant to A. above, the **Underwriter** shall advance **Defense Costs** prior to the final disposition of a **Claim**. The **Insured** shall elect counsel of its choice subject to approval by the **Underwriter**, such approval shall not be unreasonably withheld.  The **Underwriter** shall not be liable for **Loss** admitted by the **Insured** without the **Underwriter's** prior written consent, which shall not be unreasonably withheld.  The **Underwriter** reserves the right, but not the duty, at any time to take over control of the defense of any **Claim** and with the consent of the **Insured**, settle any **Claim** as the **Underwriter** deems expedient.

C.     The **Underwriter** is not obligated to pay any **Loss** after the Limit of Liability has been exhausted.

D.     In the event that a **Claim** is made against the **Insured**, the **Insured** shall take reasonable measures to protect their interests.

E.     If more than one **Insured** is involved in a **Claim,** the **Underwriter** may, in its sole discretion, appoint separate counsel for one or more of such **Insureds** if there is a material (actual or potential) conflict of interest among any such **Insureds.**

F.     The **Insured** agrees to provide the **Underwriter** with all information, assistance and cooperation which the **Underwriter** reasonably requests and agree that in the event of a **Claim** the **Insured** will do nothing that may prejudice the **Underwriter's** position or its potential rights of recovery.

G.     If with respect to any **Claim** the **Insured** refuses to consent to the first settlement acceptable to the claimant which the **Underwriter** recommends to the **Insured** in writing, and elects to further contest the **Claim,** then the **Underwriter's** liability for such **Claim** shall not exceed the amount for which the **Claim** could have been settled, including **Defense Costs** incurred, up to the date of such refusal, plus 50% of covered **Loss** in excess of such first settlement amount, it being a condition of this insurance that the remaining 50% of such **Loss** excess of the first settlement amount shall be borne by the **Insured** at their own risk and be uninsured.  Notwithstanding the foregoing, this paragraph shall not apply until the settlement amount exceeds the Retention amount stated in Item 4. of the Declarations Page.

In addition, if the **Underwriter** recommends a first settlement of a **Claim** within the Policy's applicable Limit of Liability that is acceptable to the claimant, and the **Insured** consents to such settlement, then the **Insured's** applicable Retention for such **Claim** shall be retroactively reduced by ten percent (10%).  It shall be a condition to such reduction that the **Insured** must consent to the first settlement amount within thirty (30) days after the date the **Underwriter** recommends to the **Insured** such first settlement amount, or in the case of a first settlement amount which arises from a first settlement offer by the claimant, then within the time permitted by the claimant to accept such first settlement offer, but in all events no later than thirty (30) days after the **Underwriter** recommends to the **Insured** such first settlement offer.  If the **Insured** does not consent to the first settlement within the time prescribed above, the applicable Retention amount shall remain the respective amount set forth in Item 4. of the Declarations Page, even if consent is given to a subsequent settlement.

H.     ORDER OF PAYMENTS

In the event of **Loss** arising from one or more **Claims** for which payment is otherwise due under Part 1 (Directors and Officers Liability Insurance) but which **Loss** in the aggregate exceeds the remaining available Limit of Liability for Part 1(Directors and Officers Liability Insurance), the **Underwriter** shall:

DEFS-000122

PI-PRD-2 (09/02)

    1.   first pay such **Loss** for which coverage is provided under Insuring Agreement A (INDIVIDUAL LIABILITY COVERAGE); then

    2.   with respect to whatever remaining amount of the Limit of Liability after payment of 1. above, pay such **Loss** for which coverage is provided under any other Insuring Agreement of Part 1 (Directors and Officers Liability Insurance).

IV.    NOTICE/CLAIM REPORTING PROVISIONS

Notice hereunder shall be given in writing to the **Underwriter** at the following address:

Philadelphia Insurance Companies
One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
Attention: Claims Department

The date of mailing shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice. Any notice to the **Underwriter** shall specify the Part(s) of this Policy under which the notice is being given and shall be treated as notice only under such specified Part(s).

A.    In the event that a **Claim** is made against the **Insured**, the **Insured** shall, as a condition precedent to the obligations of the **Underwriter** under this Policy, give written notice to the **Underwriter** as soon as practicable after any of the directors, officers, governors, trustees, management committee members, or members of the Board of Members first become aware of such **Claim**, but, not later than 60 days after the expiration date of this Policy, Extension Period, or **Run-Off Policy**, if applicable.

B.    If during this **Policy Period** an **Insured** first becomes aware of any circumstances which may subsequently give rise to a **Claim** being made against any **Insured** for a specific alleged **Wrongful Act**, and as soon as practicable thereafter, but before the expiration or cancellation of this Policy, gives written notice to the **Underwriter** of the circumstances and the reasons for anticipating such a **Claim,** with full particulars as to the **Wrongful Act,** dates and persons involved, then any **Claim** which is subsequently made against the **Insured** arising out of such **Wrongful Act** will be considered made during this **Policy Period**.

C.    All **Loss** arising out of the same **Wrongful Act** and all **Interrelated Wrongful Acts** shall be deemed one **Loss** on account of a one **Claim**. Such **Claim** shall be deemed to be first made when the earliest of such **Claims** was first made or first deemed made pursuant to Clause B. hereinabove.

V.    CANCELLATION AND NON-RENEWAL

A.    The **Underwriter** may not cancel this Policy except for failure to pay the premium when due, in which case the **Underwriter** shall mail written notice of cancellation to the **Private Company** at least ten (10) days prior to the effective date of cancellation.

B.    The **Private Company** may cancel this Policy for itself and all other **Insureds** by surrender of this Policy to the **Underwriter** or any of its authorized agents or by mailing to the **Underwriter** written notice stating when thereafter the cancellation shall be effective. If the **Private Company** cancels, earned premium shall be computed in accordance with the customary short rate table procedure.

DEFS-000123

C.    The **Underwriter** shall not be required to renew this Policy; however, written notice of the **Underwriter's** intent to non-renew this Policy shall be mailed to the **Private Company** at least sixty (60) days prior to expiration of the **Policy Period**.

VI.    REPRESENTATIONS AND SEVERABILITY

A.    The **Insured** represent that the particulars and statements contained in the **Application** are true and agree that (1) those particulars and statements are the basis of this Policy and are to be considered as incorporated into and constituting a part of this Policy; (2) those particulars and statements are material to the acceptance of the risk assumed by the **Underwriter** under this Policy; and (3) this Policy is issued in reliance upon the truth of such representations.

B.    Except for material facts or circumstances known to the **Individual Insured** signing the **Application,** no statement in the **Application** or knowledge or information possessed by any **Insured** shall be imputed to any other **Individual Insured** for the purpose of determining the availability of coverage.

VII.    SUBROGATION

In the event of any payment under this Policy, the **Underwriter** shall be subrogated to the extent of such payment to all of the **Insured's** rights of recovery.  The **Insured** shall execute and deliver such instruments and papers and do whatever else is necessary to secure such rights and shall do nothing to prejudice or compromise such rights without the **Underwriter's** express written consent.

VIII.    EXTENSION PERIOD

A.    If the **Underwriter** refuses to renew this Policy the following will apply:

For no additional premium, the **Underwriter** will provide a 60 day extension of the coverage granted under Part 1, 2, and 3 of this Policy for any **Claim** first made against the **Insured** during the 60 days after the non-renewal date, but only with respect to any **Wrongful Act** committed before such non-renewal date and otherwise covered by this Policy (the "Automatic Extension").  This Automatic Extension shall not apply if the **Insured** has purchased similar insurance from the **Underwriter** or any other insurer covering such **Claim.**

Upon expiration of the Automatic Extension, the **Private Company** shall have the right, upon payment of an additional 50%, 100%, 150% of this Policy's annual premium to an extension of the coverage granted by this Policy for any **Claim** first made against the **Insured** during the twelve (12) months, twenty-four (24) months, or thirty-six (36) months, respectively, after the expiration of the Automatic Extension, but only with respect to **Wrongful Acts** committed before the non-renewal date and otherwise covered by this

Policy (the "Extension Period"); provided however, that the request for this Extension Period must be made to the **Underwriter** in writing and payment of the additional premium must be made prior to the expiration of the Automatic Extension. In the event similar insurance is in force covering any **Claims** first made during this Extension Period, coverage provided by this Policy shall be excess over any such other insurance.

B.    If the **Private Company** cancels or does not renew this Policy or the **Underwriter** cancels for nonpayment of premium the following will apply:

DEFS-000124

PI-PRD-2 (09/02)

The **Private Company** shall have the right, upon payment of an additional 50%, 100%, or 150% of this Policy's annual premium, to an extension of the cover granted under Parts 1, 2, and 3 of this Policy for any **Claim** first made against the **Insured** during the twelve (12) months, twenty-four (24) months, or thirty-six (36) months, respectively, after the date of such cancellation or non-renewal, but only with respect to any **Wrongful Acts** committed before the date of such cancellation or non-renewal and otherwise covered by this Policy (the "Extension Period"); provided however, that the request for this Extension Period must be made to the **Underwriter** in writing and payment of the additional premium must be made within 60 days following the date of such cancellation or non-renewal. In the event similar insurance is in force covering any **Claims** first made during this Extension Period, coverage provided by this Policy shall be excess over any such other insurance.

If the **Underwriter** cancels for the non-payment of premium, the **Parent Organization** may purchase the Extension Period only after any earned premium due to the **Underwriter** is paid within 10 days after the date of cancellation or Policy expiration, whichever comes first.

C.    All premium paid with respect to an Extension Period shall be deemed fully earned as of the first day of the Extension Period. For the purpose of this Section VIII, any change in premium or terms on renewal shall not constitute a refusal to renew.

IX.    CHANGES

Except by written endorsement issued to the **Insured** forming a part of this Policy, nothing shall effect a change in or addition to the provisions of this Policy. Furthermore, under no circumstances shall the **Underwriter** be deemed to have waived or be estopped from asserting any right under this Policy, at law, or in equity respecting any **Claim** except as stated in writing by the **Underwriter's** authorized Claims Department representative.

X.    ASSIGNMENT

Assignment of interest in this Policy shall not bind the **Underwriter** until the **Underwriter's** consent is endorsed hereon.

XI.    AUTHORIZATION CLAUSE AND NOTICES

By acceptance of this Policy, the **Insured** agrees that the **Private Company** shall act on behalf of any **Insured** with respect to the giving and receiving of any return premiums and notices that may become due under this Policy. Notice to the **Private Company** shall be directed to the individual named in the **Application**, or such other person as shall be designated by the **Private Company** in writing. Such notice shall be deemed to be notice to any **Insured**. The **Private Company** shall be the agent of any **Insured** to effect changes in this Policy.

XII.    OTHER INSURANCE

If the **Insured** has any other insurance for **Claims** covered hereunder, the insurance provided by this Policy shall be excess over such other insurance, regardless of whether such other insurance is collectible or designated as primary or excess.

In event of a **Claim** against the **Insured** arising out of serving in his/her capacity as a director, officer, governor or trustee of an **Outside Entity** or an **Employment Practices Act** against or committed by a leased **Employee**, coverage as is afforded by this policy shall be specifically excess of indemnification provided by such **Outside Entity** or such leasing company and any insurance provided to such **Outside Entity** or such leasing company.

DEFS-000125

PI-PRD-2 (09/02)

XIII.    ACCEPTANCE

This Policy embodies all agreements existing between the parties hereunder or any of their agents relating to this insurance

XIV.    ACTION AGAINST THE UNDERWRITER; ARBITRATION

A.    No person or entity shall have any right under this Policy to join the **Underwriter** as a party to any action against the **Insured** to determine the **Insured's** liability, nor shall the **Underwriter** be impleaded by the **Insured** or their legal representatives. Bankruptcy or insolvency of the **Insured** or their successors in interest shall not relieve the **Underwriter** of its obligations hereunder.

B.    Any dispute relating to this Policy or the alleged breach, termination or invalidity thereof, which cannot be resolved through negotiations between any **Insured** and the **Underwriter**, shall be submitted to binding arbitration. The rules of the American Arbitration Association shall apply except with the respect to the selection of the arbitration panel. The panel shall consist of one arbitrator selected by such **Insured**, one arbitrator selected by the **Underwriter** and a third independent arbitrator selected by the first two arbitrators.

XV.    CHANGE IN OWNERSHIP OR CONTROL

A.    If after the inception of the **Policy Period** a **Transaction** occurs then coverage under Parts 1, 2, and 3 of this Policy shall remain in force, but only for **Claims** made during the **Policy Period** for **Wrongful Acts** committed prior to the effective date of the **Transaction** and only if the following conditions are met:

1.    the **Insured** provides written notice of the **Transaction** (other than **Public Offering**) to the **Underwriter** as soon as practicable but no later than 45 days of the effective date of such **Transaction**; and

2.    the **Insured** provides the **Underwriter** with such information as the **Underwriter** deems necessary; and

3.    in the case of a **Public Offering,** the **Insured** provides written notice of the **Public Offering** to the **Underwriter** no later than 30 days prior to the filing of any registration statement with the United States Securities and Exchange Commission.  The **Underwriter** shall provide a quotation for the **Public Offering**.

If **Insured** fails to meet conditions 1., 2., & 3. above, coverage under this Policy shall cease as of the effective date of the **Transaction** and the **Underwriter** shall return any unearned premium on a pro-rata basis.

The **Insured** shall have the right, within 45 days after the **Transaction** (or such date the **Underwriter** may agree by endorsement), to request an offer from the **Underwriter** for a **Run-Off Policy** for a term up to 6 years.  If elected, such **Run-Off Policy** shall be conditioned upon payment during the **Policy Period** by the **Insured** of any additional premium, which shall be fully earned at inception, and shall be subject to any additional terms and conditions required by the **Underwriter**.

XVI.    TERRITORY AND VALUATION

This Policy shall extend to any **Wrongful Act** committed anywhere in the world.

DEFS-000126

All premiums, limits, retentions, **Loss** and other amounts under this Policy are expressed and payable in the currency of the United States of America.  If judgment is rendered, settlement is denominated or another element of **Loss** under this Policy is stated in a currency other than United States of America dollars, payment under this Policy shall be made in United States dollars at the rate of exchange published in The Wall Street Journal on the date the final judgment is reached, the amount of the settlement is agreed upon or the other element of **Loss** is due, respectively.

XVII.    COVERAGE FOR A PRIVATE OFFERING

The **Insured** shall give the **Underwriter** written notice of a **Private Offering**, together with full details and as soon as practicable, but not later than 60 days after the effective date of such **Private Offering**. However, any **Claim** arising out of, based upon or attributable to a **Private Offering** shall be subject to the Private Offering Retention stated in Item 4. of the Declarations Page. Such Private Offering Retention shall be borne by the **Insureds**, uninsured and at their own risk, except that a Private Offering Retention shall not apply to **Loss** incurred by **Individual Insureds** for which the **Private Company** is not permitted or required to indemnify the **Individual Insured** or is financially unable to do so.

XVIII.    TWO OR MORE COVERAGE PARTS OR POLICIES ISSUED BY THE UNDERWRITER.

It is the **Underwriter's** stated intention that the various coverage parts or policies issued to the **Private Company** by the **Underwriter**, or any affiliated company, do not provide any duplication or overlap of coverage for the same **Claim**. Notwithstanding the foregoing, if more than one coverage part applies to the same **Wrongful Act** or **Interrelated Wrongful Acts**, then the maximum Limit of Liability under all such coverage parts combined shall not exceed the highest applicable Limit of Liability under any one coverage part. Notwithstanding the other insurance provision, if this Policy and any other policy issued to the **Private Company** by the **Underwriter**, or any affiliated company, apply to the same **Wrongful Act**, professional incident, occurrence, offense, accident or **Loss**, then the maximum Limit of Liability under all such policies combined shall not exceed the highest applicable Limit of Liability under any one policy.

XIX.    ALLOCATION

If both **Loss** covered by this Policy and **Loss** not covered by this Policy are incurred either because a **Claim** includes both covered and uncovered matters, or because a **Claim** is made against both the **Individual Insured** and/or the **Private Company**, and others, the **Insured** and the **Underwriter** shall use their best efforts to agree upon a fair and proper allocation of such amount between covered **Loss** and uncovered loss.  Any such allocation shall be based upon the relative legal exposures of the parties to covered and uncovered matters.

PI-PRD-72 (05/06)

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## BUSINESS ADVANTAGE PRO-PAK ELITE COVERAGE

This endorsement modifies insurance provided under the following:

PRIVATE COMPANY PROTECTION PLUS

In consideration of the premium paid, the policy is amended as follows:

1. **OUTSIDE DIRECTORSHIP MODIFICATION**

   **PART 1** **DIRECTORS & OFFICERS LIABILITY INSURANCE**, Section II (DEFINITIONS), item A. (**D&O Wrongful Act**), item 3. is replaced by the following:

   3. act, error, omission, misstatement, misleading statement, neglect, or breach of duty committed or attempted by an **Individual Insured** arising out of serving in his/her capacity as a director, officer, governor or trustee of an **Outside Entity** if such service is at the written request or direction of the Private **Company**.

2. **SECURITIES CLAIM CARVE BACK**

   **PART 1** (**DIRECTORS & OFFICERS LIABILITY INSURANCE**), Section III (EXCLUSIONS), items A. and F. are amended to include the following:

   Exclusions A. and F. shall not apply to any **Claim** brought by any security holder of the **Private Company** (whether directly or derivatively) provided that such security holder is acting totally independently of, and totally without the solicitation, assistance, participation, or intervention of any Director or Officer of the **Private Company**, or any affiliate thereof.

3. **AMENDMENT OF PRIOR AND PENDING LITIGATION**

   PART 5, (COMMON POLICY EXCLUSIONS), item F. is replaced by the following:

   1. any litigation or demand against an **Insured** pending on or before the respective Prior and Pending Date set forth in Item 5 of the Declarations Page, or the same or essentially the same facts as alleged in such prior litigation; or

   2. any **Wrongful Act**, fact, circumstance or situation which has been the subject of any written notice given under any other similar policy in which this Policy is a renewal or replacement .

4. **DELETION OF EXCLUSIONS**

   PART 5, (COMMON POLICY EXCLUSIONS), item G. and H. are hereby omitted in their entirety.

DEFS-000128

PI-PRD-72 (05/06)

**5. SEVERABILITY AMENDMENT**

PART 6, (COMMON POLICY CONDITIONS), Section VI (REPRESENTATIONS AND SEVERABILITY), items A. and B. are replaced by the following:

(A) In granting coverage to the **Insureds** under this Policy, the **Underwriter** has relied upon the declarations and statements in the written application(s) for this Policy. Such declarations and statements are the basis of the coverage under this Policy and shall be considered as incorporated in and constituting part of this Policy.

(B) Any written application(s) shall be construed as a separate application(s) for coverage by each **Insured**. With respect to the declarations and statements in such application(s):

(1) no fact pertaining to or knowledge possessed by any **Individual Insured** shall be imputed to any other **Individual Insured** for the purpose of determining if coverage is available; and

(2) only facts pertaining to and knowledge possessed by the Chief Financial Officer, President, general counsel, risk manager, Chief Executive Officer, director of human resources  or Chairperson of any part of the **Private Company** or any other individual signing such application(s) shall be imputed to the **Private Company** for the purpose of determining if coverage is available.

**6. MODIFIED CHANGE IN OWNERSHIP OR CONTROL**

PART 6, (COMMON POLICY CONDITIONS), Section XV (CHANGE IN OWNERSHIP OR CONTROL), is replaced by the following:

If after the inception of the **Policy Period** a **Transaction** occurs then this Policy shall remain in force, but only for **Claims** made during the **Policy Period** for **Wrongful Acts** committed prior to the effective date of the **Transaction** and the premium shall immediately be considered fully earned.

However, in the case of a **Public Offering**, the **Insured** shall provide written notice of the **Public Offering** to the **Underwriter** no later than 30 days prior to the filing of any registration statement with the United States Securities and Exchange Commission.  The **Underwriter** shall provide a quotation for the **Public Offering**.

The **Insured** shall have the right, within 45 days after the **Transaction** (or such date the **Underwriter** may agree by endorsement), to request an offer from the **Underwriter** for a **Run-Off Policy** for a term up to 6 years.  If elected, such **Run-Off Policy** shall be conditioned upon payment during the **Policy Period** of any additional premium, which shall be fully earned at inception, and shall be subject to any additional terms and conditions required by the **Underwriter**.

**7. FORMER OFFICER I VS. I CARVE BACK**

PART 5, (COMMON POLICY EXCLUSIONS), item K. will not apply to any **Claim**:

1. in which the party bringing the **Claim** has not served as a director, trustee, manager, officer or equivalent executive of the **Private Company** within four (4) years immediately preceding the date the **Claim** is first made;

DEFS-000129

2.  in which the party bringing the **Claim** has not brought the **Claim** in concert or cooperation with, at the suggestion of, or with the participation, active assistance, or intervention of any other **Insured** not described in line 1 above; or

3.  based upon, arising from, or attributable to any **Public Offering**.


## 8.  INDEPENDENT CONTRACTORS AS EMPLOYEES

PART 4, (COMMON POLICY DEFINITIONS), item E. is deleted and replaced with the following:

E.  **Employee** means any natural person whose labor or service is engaged by and directed by the **Private Company**, including part-time, seasonal, leased and temporary employed persons as well as volunteers, but only while that natural person is acting in his or her capacity as such. **Employee** shall include **Independent Contractor** as defined below.

**Independent Contractor** means an individual who is contracted to perform services for the **Private Company**; provided that such individual shall be deemed an **Employee** only if and to the extent that the **Private Company** provides indemnification to such individual for services rendered as if they were rendered by an actual **Employee** of the **Private Company**, and provided further that such individual(s) have been identified by the **Private Company** to the **Underwriter**.  This Policy does not cover any **Loss** which any **Insured** is obligated to pay an **Independent Contractor** for overtime pay, vacation pay, employee benefit, or any compensation for services rendered.


## 9.  AGGREGATE RETENTION

Part 6 (COMMON POLICY CONDITIONS), section II (RETENTION CLAUSE), is replaced by:

The **Underwriter** shall only be liable for that portion of **Loss** arising from each **Claim** which is in excess of the respective Retention stated in Item 4. of the Declarations Page.  Such Retention shall be borne by the **Insured**, uninsured and at their own risk, provided no Retention shall apply to **Loss** incurred by **Individual Insureds** for which the **Private Company** is not permitted or required to indemnify the **Individual Insured** or is financially unable to do so.  A single Retention shall apply to **Loss** arising from all **Claims** alleging **Interrelated Wrongful Acts**.

The Aggregate Retentions, which must be borne by the **Insured**, for all **Claims** made during the **Policy Period**, will be triple the amount of the per claim Retentions stated in Item 4. of the Declarations Page.


## 10.  CLAIM EXPENSES COVERED IN ADDITION TO LIMITS OF LIABILITY

Part 6 (COMMON POLICY CONDITIONS), section I (LIMITS OF LIABILITY) is replaced by:

I.  LIMITS OF LIABILITY

Regardless of the number of **Insureds** involved, **Claims** made, the **Underwriter's** liability under the Policy is limited as follows:

A.  With respect to coverage under Part 1 of this Policy, the **Underwriter's** maximum aggregate liability under Part 1 for all **Damages** on account of all **Claims** made during the **Policy Period**, whether covered under Insuring Agreement A, B or C, shall be the Limit of Liability for each **Policy Period** as set forth in Item 3. (A) of the Declarations.

DEFS-000130

PI-PRD-72 (05/06)

B. With respect to coverage under Part 2 and Part 3 of this Policy, the **Underwriter's** maximum aggregate liability for all **Damages** on account of all **Claims** made during the **Policy Period** shall be the Limit of Liability for each **Policy Period** as set forth in Item 3.(B) and 3.(C), respectively, of the Declarations.

C. The **Underwriter's** maximum aggregate liability for all **Damages** on account of all **Claims** first made during the **Policy Period** under all purchased Parts, combined, shall be the Aggregate Limit of Liability set forth in Item 3.(D) of the Declarations.  The Limits of Liability set forth in Item 3.(A), 3.(B), and 3.(C), are sub-limits that do not increase the **Underwriter's** maximum liability as set forth in Item 3.(D).

D. **Defense Costs** paid by the **Underwriter** are in addition to and not a part of the Limit of Liability specified in Item 3. of the Declarations.  Payment by the **Underwriter** of **Defense Costs** incurred on account of any **Claim** will not reduce the Limit of Liability stated in Item 3. of the Declarations.  The most the **Underwriter** will pay for **Defense Costs** is equal to the applicable Limit of Liability stated in Item 3. of the Declarations.  The **Underwriter** is not obligated to pay **Defense Costs** nor **Damages** after the applicable Limit of Liability has been exhausted.

E. The Limit of Liability for any Extension Period, if applicable, shall be a part of and not in addition to the respective Limit of Liability applicable to the **Policy Period**.

Part 6 (**COMMON POLICY CONDITIONS**), section III (DEFENSE AND SETTLEMENT), items C and G are replaced by.

C. The Underwriter is not obligated to pay any Loss after the Limit of Liability has been exhausted.  The **Underwriter** may elect to tender an amount equal to the remaining Limit of Liability applicable to **Damages** to the **Private Company** at any time, which will be considered to fully satisfy the **Underwriter's** obligation with regard to that **Claim**.

G. If with respect to any **Claim** the **Insured** refuses to consent to the first settlement acceptable to the claimant which the **Underwriter** recommends to the **Insured** in writing, and elects to further contest the **Claim,** the **Underwriter's** liability for such **Claim** shall not exceed the amount for which the **Claim** could have been settled, up to the date of such refusal.  Notwithstanding the foregoing, this paragraph shall not apply until the settlement amount exceeds the Retention amount stated in Item 4. of the Declarations Page.

In addition, if the **Underwriter** recommends a first settlement of a **Claim** within the Policy's applicable Limit of Liability that is acceptable to the claimant, and the **Insured** consents to such settlement, then the **Insured's** applicable Retention for such **Claim** shall be retroactively reduced by twenty-five percent (25%).  It shall be a condition to such reduction that the **Insured** must consent to the first settlement amount within thirty (30) days after the date the **Underwriter** recommends to the **Insured** such first settlement amount, or in the case of a first settlement which arises from a first settlement offer by the claimant, then within the time permitted by the claimant to accept such first settlement offer, but in all events no later than thirty (30) days after the **Underwriter** recommends to the **Insured** such first settlement offer.  If the **Insured** does not consent to the first settlement within the time prescribed above, the applicable Retention amount shall remain the respective amount set forth in Item 4. of the Declarations Page, even if consent is given to a subsequent settlement.

11.    MODIFICATION OF PART 3 (FIDUCIARY LIABILITY INSURANCE)

**This section only applies if a Limit of Liability is noted for Fiduciary Liability on the Declarations Page.**

DEFS-000131

PI-PRD-72 (05/06)

Part 3, Section I (Insuring Agreement), is deleted in its entirety and is replaced by the following:

A.   The **Underwriter** shall pay on behalf of the **Insured**, **Loss** from **Claims** made against the **Insured** during the **Policy Period** (or, if applicable, the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for a **Fiduciary Liability Act**.   This coverage shall not apply any claims arising out of any alleged violation of Title II of the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and amendments to such law or regulations promulgated under such law concerning privacy of health information or arising out of **Managed Care** liability.

In the event of the Insured enters into a voluntary settlement program with the Internal Revenue Service (or any similar state or federal agency), the **Company,** following prior notice provided by the **Company** to the **Underwriter,** during the **Policy Period** (or any applicable Extended Reporting Period), of the **Company's** intent to enter into said settlement program, shall pay on behalf of the **Insureds** any fees, penalties or sanctions imposed by law under said settlement program for which Inured is legally liable as a result of a **Fiduciary Liability Act** in an amount not to exceed $50,000. Such amount shall be part of and not in addition to the Limit of Liability, as set forth in Item 3(A) of the Declarations.  In no case, however, shall the Underwriter pay for any costs of corrections.

B.   The **Underwriter** shall pay on behalf of the **Insured**, **Loss** from **Claims** made against the **Insured** during the **Policy Period** (or, if applicable, the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for a **Fiduciary Liability Act** arising from any alleged violation of Title II of the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and amendments to such law or regulations promulgated under such law concerning privacy of health information.  Coverage under this paragraph is subject to a sublimit of liability of $25,000.  Said sublimit shall be part of and not in addition to the Limit of Liability, as set forth in Item 3(A) of the Declarations.

C.   The **Underwriter** shall pay on behalf of the **Insured**, **Defense Costs** from **Claims** made against the **Insured** during the **Policy Period** (or, if applicable, the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for a **Fiduciary Liability Act** in connection with **Managed Care** liability solely as regards any **Managed Care** plans sponsored solely by the **Private Company** and insured and administered by an outside insurance carrier. Coverage under this paragraph is subject to a sublimit of liability of $100,000.  Said sublimit shall be part of and not in addition to the Limit of Liability, as set forth in Item 3(A) of the Declarations.

For the purposes of this endorsement **Managed Care** shall mean any plan providing comprehensive medical care to plan members on the basis of a prepaid contract and which by virtue thereof limits the choices of medical care and service providers available to plan members.

Part 3, Section II, Definitions, Paragraph B is deleted in its entirety and is replaced by the following:

B.   **Benefit Plan** means:

1.   any **Welfare Benefit Plan** which was, is now or becomes sponsored by the **Private Company** solely for the benefit of the **Employees** of the **Private Company**;

2.   any **Pension Benefit Plan** which was, on or prior to the effective date of this Policy, sponsored by the **Private Company** solely for the benefit of the **Employees** of the **Private Company**, provided that coverage was available in respect of such **Pension Benefit Plan** under any policy of which this Policy is a renewal or replacement and such **Pension Benefit Plan** has been reported in writing to the **Underwriter** as part of the **Application**;

DEFS-000132

3.  any **Pension Benefit Plan** created or acquired (through merger, consolidation or otherwise) during the **Policy Period** by the **Insured** solely for the benefit of the **Employees** of the **Private Company**, but only upon the condition that within 90 days after such creation or acquisition, the **Insured** shall have (i) provided written notice to the **Underwriter** of such newly created **Pension Benefit Plan**, and (ii) agreed to any additional terms and paid any additional premium required by the **Underwriter** in its sole discretion.  The 90-day notice requirement shall not apply, however, if the total assets of the acquired or formed **Pension Benefit Plan**, as of the effective date of such acquisition or formation, do not exceed ten percent (10%) of the total plan assets shown on the most recent application submitted by the Insured Organization, or (2) the acquisition or formation occurs less than ninety (90) days prior to the end of the Policy Period; and

4.  any government-mandated benefit program for workers compensation, unemployment, social security or disability benefits for **Employees** of the **Private Company**.

However, **Benefit Plan** does not include any multi-employer plan or any employee stock ownership plan unless said plan is added by specific written endorsement to this policy.

Coverage for **Benefit Plans** which are sold, terminated or spun-off during or prior to the **Policy Period** shall apply only with respect to any **Fiduciary Liability Act** occurring prior to the date of such sale or spin-off, or in the case of termination, prior to the final date of asset distribution of such **Benefit Plan**.

## 12. AMEND DEFINITION OF THIRD PARTY

Part 2, Section II Definitions, Paragraph C is deleted in its entirety and replaced with the following:

C.  **Third Party** means any natural person who is not an **Employee** of the **Private Company**.

## 11. MODIFICATION OF SPOUSAL EXTENSION

PART 4, (COMMON POLICY DEFINITIONS), item G. paragraph 2, is deleted and replaced with the following:

2.  the lawful spouse or **Domestic Partner** of a director, officer, governor, trustee, or equivalent executive of the **Private Company**, but only for actual or alleged **Wrongful Acts** of such person for which such spouse may be liable as the spouse of such person.  Domestic Partner means any person who qualifies as a domestic partner under the provisions of any federal, state or local statute or regulation, or under the terms and provisions of any employee benefit or other program established by the **Private Company**;

DEFS-000133

PI-PRD-75 (12/03)

## <u>THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.</u>

# AMENDMENT OF EXCLUSIONS

This endorsement modifies insurance provided under the following:

PRIVATE COMPANY PROTECTION PLUS

Part 1 (**DIRECTORS & OFFICERS LIABILITY INSURANCE**), section III (EXCLUSIONS), item E. is replaced by:

E.   for any actual or alleged violation(s) of any of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act  (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, any rules or regulations of the foregoing promulgated thereunder, and amendments thereto or any similar federal, state, local or foreign statutory law or common law; provided, however, this exclusion shall not apply to a **Claim** for **Retaliation**; provided, further, however, there is no coverage provided under this policy for any **Claim** related to, arising out of, based upon, or attributable to the refusal, failure or inability of any **Insured(s)** to pay **Earned Wages** (as opposed to tort-based back pay or front pay damages) or for improper payroll deductions taken by any **Insured(s)** from any **Employee(s)** or purported **Employee(s)**, including, but not limited to, (i) any unfair business practice claim alleged because of the failure to pay **Earned Wages**, or (ii) any **Claim** seeking **Earned Wages** because any **Employee(s)** or purported **Employee(s)** were improperly classified or mislabeled as "exempt."

Part 2 (**EMPLOYMENT PRACTICES LIABILITY INSURANCE**), section III (EXCLUSIONS), item B. is replaced by:

B.   for any actual or alleged violation(s) of any of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act  (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, any rules or regulations of the foregoing promulgated thereunder, and amendments thereto or any similar federal, state, local or foreign statutory law or common law; provided, however, this exclusion shall not apply to a **Claim** for **Retaliation**; provided, further, however, there is no coverage provided under this policy for any **Claim** related to, arising out of, based upon, or attributable to the refusal, failure or inability of any **Insured(s)** to pay **Earned Wages** (as opposed to tort-based back pay or front pay damages) or for improper payroll deductions taken by any **Insured(s)** from any **Employee(s)** or purported **Employee(s)**, including, but not limited to, (i) any unfair business practice claim alleged because of the failure to pay **Earned Wages**, or (ii) any **Claim** seeking **Earned Wages** because any **Employee(s)** or purported **Employee(s)** were improperly classified or mislabeled as "exempt."

Part 4 (**COMMON POLICY DEFINITIONS**), is supplemented by:

**Earned Wages** means wages or overtime pay for services rendered.

DEFS-000134

PI-PRD-77 (01/04)

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## AMENDMENT OF CANCELLATION PROVISION

This endorsement modifies insurance provided under the following:

PRIVATE COMPANY PROTECTION PLUS

Part 6 Common Policy Conditions, section V. Cancellation and Non-Renewal, item B. is amended to include the following:

If, during the policy period, the **Underwriter's** *A.M. Best* rating is downgraded, and the **Private Company** elects to cancel the policy, then the earned premium will be calculated on a pro-rata basis.

All other terms and conditions of this Policy remain unchanged.

DEFS-000135

PI-SLD-001 (01/15)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

DIRECTORS AND OFFICERS LIABILITY

If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions  of the federal Terrorism Risk Insurance Act, to be an act of terrorism subject to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

1. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

3. The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Policy.

Includes copyrighted material of the Insurance Services Office Inc., used with its permission.

DEFS-000136